**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ADRIANE GLAZIER TUROW, individually and as beneficiary of the AJJ Investment Trust and Adriane S. Homer Descendant's Trust,<br><br>        Plaintiff,<br><br>    v.<br><br>JOSHUA M. GLAZIER, individually and as trustee of AJJ Investment Trust and the Adriane S. Homer Descendant's Trust, DANIEL J. ABDO, and GLAZIER CORPORATION,<br><br>        Defendants. | **JURY TRIAL DEMANDED**<br><br>Case No. _____ |

## COMPLAINT

Plaintiff Adriane Glazier Turow ("Plaintiff" or "Adriane"), individually and as a beneficiary of the AJJ Investment Trust ("AJJ Trust") and the Adriane S. Homer Descendant's Trust ("Adriane Trust"), by and through her undersigned attorneys, for her Complaint against Defendants Joshua M. Glazier, Trustee of the AJJ Trust and of the Adriane Trust, Daniel J. Abdo, and Glazier Corporation (collectively, "Defendants") hereby alleges as follows:

### Nature of the Action

1.      This action results from the self-dealing, breaches of fiduciary duty and fraud by a trustee in the management of a trust established by his father.

2.      Robert Glazier ("Bob") established a trust (the AJJ Trust), as part of his estate plan, to hold real estate and other assets he intended to gift equally to three of his children, Joshua Glazier, Jordan Glazier ("Jordan") and Adriane, thereby providing for the three children and their heirs after his death.

1

3.      Bob entrusted his eldest son, Joshua M. Glazier, to act as co-Trustee of the AJJ Trust.  After Bob's death, Joshua Glazier also became President and CEO of Bob's real estate investment company, Glazier Corporation ("Glazier Corp.").

4.      Glazier Corp. served as the general partner (and 1% owner) in numerous limited partnerships that Bob had created to pursue real estate investments.  Furthering the goals of the AJJ Trust, Bob had made the AJJ Trust a limited partner in all of these partnerships.

5.      Vested with effectively unilateral control as Trustee of the AJJ Trust and President and CEO of Glazier Corp., Joshua Glazier operated Bob's real estate businesses and manipulated Bob's estate plan to benefit himself at the expense of Adriane.

6.      Unbeknownst to Adriane, over the nearly twenty-three years he has been Trustee of the AJJ Trust, Joshua Glazier devised and executed a scheme and artifice to defraud the AJJ Trust and its beneficiaries (including Adriane, the Adriane Trust, and Adriane's two daughters) of money and property.

7.      Using his positions as Trustee of the AJJ Trust and of the Descendant's Trusts, and President and CEO of Glazier Corp., Joshua Glazier, through multiple interrelated schemes to defraud: (a) embezzled and converted the assets and income of the AJJ Trust for his and/or Glazier Corp.'s use; (b) diverted income rightly belonging to the AJJ Trust and its beneficiaries to himself, his personal trusts and/or other entities he controlled; (c) lied about the AJJ Trust's holdings to avoid paying the trust its rightful share of earnings; (d) attempted to cut the AJJ Trust out of its partnership interests; (e) filed false tax returns; (f) paid himself exorbitant "management fees" that were impermissible under the governing agreements and applicable law, resulting in further reduction of the AJJ Trust's income; and (g) made repeated and deliberate misrepresentations to conceal his wrongdoing.

8.      Joshua Glazier's wrongful conduct was intended to increase his personal wealth and the funds available to entities he controlled, to the detriment of the AJJ Trust and its beneficiaries.

9.      To accomplish his improper goals, Joshua Glazier enlisted the help of his longtime business associate, defendant Daniel Abdo, who directly aided in and benefitted from the breaches of Joshua Glazier's fiduciary duties to the beneficiaries.

10.      Joshua Glazier also leveraged his position as President and CEO of Glazier Corp. to misappropriate AJJ Trust assets into Glazier Corp.'s accounts, often ignoring any distinction between the AJJ Trust and the company (or the company and his personal accounts).

11.      While looting the AJJ Trust for his own gain, Joshua Glazier not only went to great lengths to hide his misconduct, he claimed he was being overly generous to the beneficiaries, stating in an email that he "often treated the [AJJ] trust much better than an arm's length party" and that he "was a responsible and generous big brother to [Adriane] . . . and [her] famil[y]." His concealment and misrepresentations enabled Joshua Glazier to get away with his misconduct for decades and escape detection.

12.      After over twenty years of deception, obfuscation and outright lies, Joshua Glazier's scheme was unveiled in February 2020 when, after being confronted with evidence of his wrongdoing, he finally admitted to some of the vast scope of the AJJ Trust's interests that he had hidden from Adriane. Even still, the full scope of Joshua Glazier's scheme remains uncertain and only comprehensive discovery will shine a light on the true breadth of his misconduct.

13.      Based on the information currently known, Adriane brings claims against Joshua Glazier for breach of fiduciary duty, fraud, and RICO violations; against Abdo for participation in breach of fiduciary duty and unjust enrichment; and against Glazier Corp. for unjust enrichment.

## The Parties

14.     Plaintiff Adriane Glazier Turow (formerly known as Adriane S. Homer) is a natural person domiciled in Florida.  She is one of three beneficiaries of the AJJ Trust and the sole beneficiary of a separate subsidiary trust created by the AJJ Trust Agreement, the Adriane S. Homer Descendant's Trust ("the Adriane Trust").  Plaintiff is the sister of Defendant Joshua Glazier and the third beneficiary, Jordan Glazier.  Adriane has two daughters who each will receive a 50% share of Adriane's beneficial interests in the AJJ Trust and the Adriane Trust if Adriane passes away.

15.     Defendant Joshua Glazier is a natural person domiciled in Chicago, Illinois.  From the inception of the AJJ Trust, Joshua Glazier has served as a Trustee of the AJJ Trust and of each Descendant's Trust (defined below), including the Adriane Trust.  He is a beneficiary of the AJJ Trust.  Joshua Glazier is also the President and CEO of Defendant Glazier Corp., which titles he has held since 1998.  Joshua Glazier is also the sole beneficiary of the JMG Investment Trust ("JMG Trust").

16.     Defendant Glazier Corp. is a Delaware corporation with its headquarters and principal place of business in Chicago, Illinois.  Since approximately 1989, it has operated as a boutique real estate development company that focuses its activities in Illinois.

17.     Defendant Daniel J. Abdo ("Abdo") is a natural person domiciled in Illinois.  Abdo is a real estate professional who became associated with Glazier Corp. in or about 1998.

## Jurisdiction and Venue

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964.  The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)

because: (1) there is complete diversity of U.S. citizenship between Plaintiff and Defendants; and (2) the amount in controversy exceeds $75,000.

19.     With respect to the complete diversity of U.S. citizenship:

    a.  Plaintiff is a citizen of Florida.

    b.  Defendant Joshua Glazier is a citizen of Illinois.

    c.  Defendant Glazier Corp. is a citizen of Illinois and Delaware.

    d.  Defendant Abdo is a citizen of Illinois.

20.     This Court has personal jurisdiction over Defendant Joshua Glazier because he resides in Illinois and conducts business within Illinois; and because the causes of action described herein arose from the commission of a tortious acts within Illinois, breaches of fiduciary duties within Illinois, the management of the AJJ Trust, which is administered in Illinois, the exercise of his powers as fiduciary in Illinois, and the performance of his duties as an officer of Glazier Corp., which has its principal place of business in Illinois.

21.     This Court has personal jurisdiction over Defendant Abdo because he resides in Illinois and conducts business within Illinois.

22.     This Court has personal jurisdiction over Defendant Glazier Corp. because it has its principal place of business and does business in Illinois.

23.     Venue is proper in this district pursuant to: (a) 18 U.S.C. § 1965; (b) 28 U.S.C. § 1391(b)(1) because all defendants are residents of Illinois and Defendants Joshua Glazier and Abdo reside in this judicial district; (c) 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district; and/or (d) 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this district with respect to this action.

**Facts Common to All Counts**

24.     Bob Glazier was a real estate developer.  His business strategy was to purchase and develop income-producing commercial properties that he could lease to other businesses and collect ongoing rental income.  When he sold a property, he would use the proceeds to purchase and develop other income-producing properties.  In this way, he ensured he always had an income stream from his properties.

25.     On May 15, 1997, as part of his estate planning, Bob created a trust to benefit three of his children, Adriane, Joshua, and Jordan, and their descendants (the AJJ Trust).  The Trust Agreement Establishing the AJJ Investment Trust, dated May 15, 1997 ("Trust Agreement"), provided that the trust estate was to be retained in three separate trusts, one for each child (each, a "Descendant's Trust").  A true and correct copy of the Trust Agreement is attached hereto as Exhibit 1.

26.     On November 29, 1998, Bob died.  After Bob's death, Joshua Glazier became President and CEO of Glazier Corp., in which role he has served since then.  In that role, Joshua Glazier has had complete control over the Glazier Corp.'s operations, finances, and business strategy.

*The AJJ Trust Agreement*

27.     Joshua Glazier and Jonathan L. Mills ("Mills") were named as the initial co-trustees of the AJJ Trust and each of the Descendant's Trusts, including the Adriane Trust.  However, on information and belief, Mills did not take an active role as trustee.

28.     On information and belief, Joshua Glazier did not consult with Mills on the vast majority of decisions relating to the AJJ Trust, in direct contravention of the Trust Agreement.

29.     In or about 2004, Mills resigned from his position as co-trustee.  Joshua Glazier did not inform Adriane at the time of Mills' resignation that Mills had resigned, nor did he advise Adriane on the appointment of a new co-trustee.

30.     Under the Trust Agreement, Martin Weinstein ("Weinstein") was designated as successor trustee to Mills.  Accordingly, Weinstein was supposed to take over when Mills resigned per the express terms of the Trust Agreement.  On information and belief, Weinstein did not take over for Mills and never had any role in managing the AJJ Trust.  Weinstein passed away in April 2020.

31.     On information and belief, Joshua Glazier designated his mother, Babette Glazier ("Babette"), as co-trustee.  Joshua Glazier did not contemporaneously inform Adriane that Babette had been made a co-trustee.  Instead in July 2014, Joshua Glazier told Adriane that he "may have named" Babette as a trustee.

32.     Appointing Babette as a co-trustee was done to further consolidate Joshua Glazier's control.  Babette does not have any business experience and, since Bob's death, she has relied on Joshua Glazier for all financial matters.  Babette currently suffers from reduced mental capacity and is 91 years old.  On information and belief, Babette was never aware that she was nominally a co-trustee of the AJJ Trust.  On information and belief, Babette had no active role in managing the AJJ Trust.

33.     As evidence of Joshua Glazier's indifference to who was the nominal co-trustee, AJJ Trust tax returns identify Mills as a co-trustee in the same years as AJJ Trust investment account statements show Babette as the co-trustee.

34.     In reality, Joshua Glazier has acted as the *de facto* sole Trustee of the AJJ Trust and Descendant's Trusts at all times since Bob's death.  Joshua Glazier ignored the provisions of the

Trust Agreement that required decisions to be made jointly by co-trustees and instead acted unilaterally.

35.     As Trustee, Joshua Glazier was responsible for all financial aspects of the AJJ Trust and the Descendant's Trusts, including making all financial decisions.  Among his responsibilities was to maintain regular and accurate records and to account for all transactions impacting the AJJ Trust.  However, Joshua Glazier did not provide Adriane with regular records, and never provided an accurate accounting of the AJJ Trust to Adriane.

36.     The AJJ Trust held an interest in numerous limited partnerships that were formed to hold Bob's real estate: Hutchinson, GlazCo, and the Birds (defined below).

a.    <u>Hutchinson</u>: The AJJ Trust held a 75% interest in Hutchinson, which owned at least four properties.  Glazier Corp., Hutchinson's general partner, held a 1% interest, and JMG Trust – i.e. Joshua Glazier's personal trust – owned a 24% interest.

b.    <u>GlazCo</u>:  The AJJ Trust held a 37.5% interest in GlazCo until approximately 1999, when it increased its holding to 62.5%.  At all times, JMG Trust held a 36.5% interest in GlazCo, and Glazier Corp., the general partner, held a 1% interest.  GlazCo owned at least two properties.

c.    <u>Birds</u>:  Bob formed six limited partnerships named after birds: Blue Jay, Condor, Dove, Eagle, Sandpiper, and Sparrow (collectively, the "Birds"), to hold real estate purchased and developed in the name of the particular Bird. Because Joshua Glazier attempted to conceal the existence of the Birds and repeatedly lied about their origin and ownership, claiming they were entirely his own investments, until February 2020, Adriane did not know that the Birds

had been formed during her father's lifetime under agreements that made the AJJ Trust a limited partner in each Bird. The JMG Trust and Abdo were also limited partners in each Bird, and Glazier Corp. was the general partner of each Bird (collectively with the AJJ Trust, the "Bird Partners"). The Bird Partners' interests in each Bird varied, but Glazier Corp.'s interest was always 1%.

37. Under their partnership agreements, each Bird Partner was to receive distributions in its proportionate share from any property that Bird owned, including rental income and/or proceeds from the sale of the properties.

38. Through the Bird partnership agreements, Bob established the AJJ Trust as a partner in all of Glazier Corp.'s future real estate developments, thereby providing the Trust's beneficiaries with continual financial support.

39. Each Bird partnership agreement expressly provided that the Bird Partners would use the Birds as the vehicle to "pursue all real estate projects of the Partners and their respective affiliates" so long as Abdo devoted his full business attention to projects Glazier Corp. pursued.

40. Abdo remains affiliated with Glazier Corp. today, provided his full business attention to Glazier Corp.'s projects through 2007, and, on information and belief, has continued to do so through the present time.

41. Moreover, the AJJ Trust Agreement defined "trust estate" to include all property initially in the Trust, as well as all additions to such property or reinvestment of such property.

42. In each Bird partnership agreement:

    a. The Bird Partners warranted and represented that "it [would] not sell or dispose of the Percentage Interests except in compliance with applicable federal and state securities laws."

    b.  The Bird Partners agreed that the "General Partner [Glazier Corp.] will not be entitled to any administrative or management fees with respect to the operation of Partnership properties," unless Abdo ceased to provide full time services to Partnership projects, in which case the General Partner could "charge reasonable market-based fees related to the management and sale of the Partnership's properties."

    c.  The Bird Partners agreed that "[a]ny contract with a Partner, or any person related to or affiliated with a Partner, will be on terms and prices which could have been obtained from unaffiliated third parties."

43.    Until February 26, 2020, Joshua Glazier actively concealed the AJJ Trust's interest in the Birds, claiming they were his personal investments.

44.    As a limited partner of Hutchinson, GlazCo, and the Birds (collectively, the "HGB Partnerships"), the AJJ Trust was entitled to its share of the income earned by each of the HGB Partnerships. That income included rents from any tenants of the commercial developments, as well as the proceeds from the sale of any property the HGB Partnerships owned.

45.    After Bob's death, Joshua Glazier formed other partnerships into which he transferred certain real estate owned by the Birds and acquired other properties. Following his father's precedent, Joshua Glazier named the newly formed partnerships after birds. Among the newly formed partnership were Cardinal and Pelican (the "Excluded Birds").

46.    The AJJ Trust is not listed as a partner in the partnership agreements for the Excluded Birds, notwithstanding the written agreement between the AJJ Trust, Joshua Glazier and Abdo to include each other in all of their real estate ventures. Instead, according to each Excluded

Bird's partnership agreement, the partners in each Excluded Bird are Abdo, Glazier Corp., and Joshua Glazier.

47.     As a tacit acknowledgment that the AJJ Trust did in fact have a valid interest in the Excluded Birds, however, the tax returns for several years for Cardinal and Pelican list the AJJ Trust as a partner.  These tax returns were prepared at the direction of Joshua Glazier, signed by Joshua Glazier and sworn under penalty of perjury to be accurate prior to filing with the IRS. Adriane never saw any of the Excluded Birds' tax returns until 2020.

48.     Adriane has been denied access to tax returns or other information regarding several other partnerships Joshua Glazier formed, including Finch, Stork, Robin, and others.   On information and belief, Joshua Glazier formed several such partnerships with Abdo to pursue real estate investments and excluded the AJJ Trust in direct contravention of the terms of the Bird partnership agreements.

49.     In the nearly twenty-three years he has served as Trustee, Joshua Glazier failed to keep Adriane informed about the AJJ Trust's finances and holdings.  He failed to provide regular and accurate accountings and, instead, went out of his way to conceal, misrepresent, and grossly understate the scope of the AJJ Trust's holdings, as further detailed below.

*Joshua Glazier's Wrongdoing is Gradually Revealed*

50.     In August 2017, Joshua Glazier was preparing to sell the last property in which the AJJ Trust held an interest and, accordingly, wind up the AJJ Trust and distribute the remaining cash to its beneficiaries.

51.     Around the same time, Jordan hired an accountant, Michael Eggert of CBIZ ("Eggert"), to review the finances of the AJJ Trust.

11

52.     In August 2018, Eggert presented a report that indicated the distributions each beneficiary of the AJJ Trust was entitled to (the "Eggert Report"). The Eggert Report was prepared based almost exclusively upon documents and information provided to Eggert by Joshua Glazier. Eggert expressly stated that his analysis was necessarily limited by the universe of information Joshua Glazier disclosed, while also acknowledging certain irregularities in the information Joshua Glazier provided. The Eggert Report grossly understated the assets of the AJJ Trust and the amounts each of the beneficiaries were entitled to at that time.

53.     After the Eggert Report was provided to Joshua Glazier, Jordan and Adriane, Joshua Glazier used it to seek releases from Jordan and Adriane (the "Beneficiaries") in exchange for making distributions of their purported shares of the AJJ Trust. In the releases, Joshua Glazier represented and warranted that he made a "full, fair and complete disclosure . . . of all information related to the Trust," and had provided Eggert with "all information they requested of him, and which he has the ability to provide. . . ." Joshua Glazier also agreed that if any asset was unknown at the time of the Eggert Report "through intentional nondisclosure or fraud" of the Trustee, then Joshua Glazier would forfeit his 1/3 share of the asset.

54.     Joshua Glazier pressed Adriane to enter into a settlement agreement and added language providing that Adriane would waive all remedies for any undisclosed fraud he may have committed as Trustee. Adriane refused to agree to that term.

55.     Then, eight months after the Eggert Report was shared with the Beneficiaries, on April 11, 2019, Joshua Glazier disclosed for the first time the existence of a property at 6201 N. Clark Street, Chicago, which GlazCo had owned until Joshua Glazier sold it in 1999. Although the AJJ Trust undeniably had an interest in the property as a limited partner of GlazCo, Joshua Glazier admitted that he had not disclosed to Eggert any information about this property.

56.     Notwithstanding the disclosure of this new property at 6201 N. Clark Street, Jordan agreed to accept Joshua Glazier's representations and the balance of the information in the Eggert Report and, accordingly, Jordan signed a settlement agreement in which he agreed to release claims against Joshua Glazier in exchange for a final distribution of his purported share of the AJJ Trust.

57.     Adriane, however, would not sign the release.

58.     Instead, starting in the spring of 2019, Adriane began investigating GlazCo's, Hutchinson's, and Glazier Corp.'s real estate holdings.  That investigation revealed that the AJJ Trust had interests in numerous additional properties that Joshua Glazier had failed to identify as assets of the AJJ Trust, and which, in fact, Joshua Glazier had hidden from Adriane and Eggert. Adriane's investigation also uncovered numerous inconsistencies with what Joshua Glazier had told Eggert.

59.     Adriane confronted Joshua Glazier with this information, through their respective counsel, on November 19, 2019.  In response, on February 26, 2020, Joshua Glazier produced to Adriane *hundreds* of new documents that had been in his possession, but which he had never previously provided to Eggert or Adriane.  These documents revealed millions of dollars in income belonging to the AJJ Trust which, due to Joshua Glazier's concealment, Adriane previously had no knowledge of and of which the AJJ Trust and she had been wrongly deprived.  These disclosures also revealed for the first time the roles of Abdo and Glazier Corp. in furthering that scheme.

60.     Those new documents confirmed for the first time that the AJJ Trust had a partnership interest in the Birds and the Excluded Birds, and, consequently, a financial interest in numerous additional properties beyond the universe that had been included in the Eggert Report, which had been limited to only properties held by GlazCo and Hutchinson.

61.     In connection with disclosing the new documents on February 26, 2020, Joshua Glazier disavowed the Eggert Report, expressly stating that it was based on inaccurate information. Joshua Glazier admitted the Eggert Report was incomplete and had excluded all information on the Birds and their holdings, in which the AJJ Trust had an interest.

62.     The Eggert Report was based on inaccurate information because Joshua Glazier had hidden from Eggert the hundreds of documents that he first shared with Adriane in February 2020.

63.     Moreover, even after disclosing that the AJJ Trust had an interest in numerous additional properties, Joshua Glazier continued to misrepresent the assets of the AJJ Trust through a series of documents he drafted to attempt to justify his past concealment of those assets and diminish the amounts owed to the AJJ Trust.

64.     To further that goal, Joshua Glazier hired a new accountant, Jim Donenberg of Warady & Davis LLP, to prepare a new report about the AJJ Trust's assets (the "Donenberg Report"). The Donenberg Report's conclusion regarding the AJJ Trust's assets differed significantly from the Eggert Report's conclusion, in large part because the Donenberg Report included assets held by the Birds that Joshua Glazier had failed to disclose to Eggert. However, the Donenberg Report continued Joshua Glazier's long history of undervaluing the assets of the AJJ Trust by, among other things, excluding AJJ Trust assets that are disclosed on filed tax returns and fabricating fees and charges that were not contemporaneously incurred or reported in filed tax returns.

65.     Documents and information that Adriane obtained in February 2020 show that for nearly twenty-three years, Joshua Glazier has defrauded Adriane and converted millions of dollars that rightfully belonged to the AJJ Trust and its beneficiaries.

14

66.     To accomplish his fraud and conversion, Joshua Glazier carried out the interrelated schemes described more fully below.

A.  Commingling the AJJ Trust's Funds and Converting Those Funds to His or Glazier Corp.'s Use.

67.     As described above, the AJJ Trust should have received distributions of income and capital from the real estate interests that it owned through the HGB Partnerships, which included proceeds from the sales of properties as well as rental income.  One-third of those proceeds then belonged to the Adriane Trust.

68.     However, Joshua Glazier diverted nearly all of the AJJ Trust's share of the HGB Partnerships' earnings into Glazier Corp.'s accounts—which he used to conduct Glazier Corp.'s business operations, including, on information and belief, paying his own salary, management fees, and dividends—and/or his own personal accounts.  As a result of this conversion of funds, the AJJ Trust and the Adriane Trust have since their establishment received only a tiny fraction of the sales proceeds to which they were entitled, and almost none of the annual rental income.

69.     From 1998 through 2018, the HGB Partnerships had total revenue of more than $30 million.  Yet, from the inception of the AJJ Trust until 2018, when the AJJ Trust was purportedly wound up, the Adriane Trust and/or Adriane received only approximately $560,000, all of which was distributed between 2006 and 2007.  Joshua Glazier converted the remaining earnings due to the AJJ Trust and the Adriane Trust to Glazier Corp., himself, and/or his business partner, Abdo.

70.     Each of the partnership agreements required the Glazier Corp., as the General Partner, to make annual distributions to the partners of "Distributable Funds," which reflected the partnership's net income after allocating a reasonable reserve.  As President and CEO of Glazier Corp., Joshua Glazier controlled the distributions.  Rather than making distributions to the AJJ Trust as provided for in the partnership agreements, Joshua Glazier retained the HGB Partnerships'

annual net income and cash flow (including the AJJ Trust's share) in Glazier Corp.'s accounts and converted the funds for his business and, on information and belief, personal use. In total, Joshua Glazier converted rental income from at least thirty properties in which the AJJ Trust had an interest and kept the funds for his own or Glazier's Corp.'s use. Almost all of those funds remain in his possession and control to this day.

71.     Further, throughout the duration of the AJJ Trust, the HGB Partnerships recorded almost $17 million in gross rental income and investment income on their federal income tax returns, Form 1065s. Because Joshua Glazier unlawfully paid more than $3 million in management fees to himself and his affiliates (as described in Paragraphs 113-123 below), those gross income amounts yielded only $1.6 million in net income from rental operations, none of which was paid to the AJJ Trust as a required annual distribution. The income amounts also yielded approximately $700,000 in investment income, none of which was annually distributed to the AJJ Trust. Aside from a small distribution to Adriane in 2021, none of the annual rental or investment income has been paid to Adriane or the Adriane Trust.

72.     The failure to distribute to the AJJ Trust its proportional share of the net income and investment income deprived Adriane and the Adriane Trust of substantial assets, which was also the result of Joshua Glazier's unlawful and excessive management fees and other charges.

73.     For most of the period the AJJ Trust operated, Joshua Glazier never utilized a separate bank account or investment account for the AJJ Trust or for any of the Descendant's Trusts, as a trustee is required to do.

74.     Even after Joshua Glazier opened an account for the AJJ Trust (the "AJJ Account") in 2001, he used it only selectively. That is, on the occasions he deposited funds into the AJJ Account, he generally deposited only a portion of the proceeds the AJJ Trust earned through the

HGB Partnerships. Joshua Glazier never opened individual accounts for any of the Descendant's Trusts.

75.     In approximately 2009, Joshua Glazier stopped using the AJJ Account, reverting back to the simpler (but unlawful) practice of depositing all of the AJJ Trust's income and earnings directly into Glazier Corp.'s accounts. He made this change even though the AJJ Trust continued to own interests in the HGB Partnerships, each of which owned properties that generated income and/or could be sold, and the AJJ Trust continued to pay its share of taxes due on reported income.

76.     Also in 2009, Joshua Glazier declared that he was terminating the Descendant's Trusts, including the Adriane Trust, which the Trust Agreement unequivocally established and which he had no power to terminate. Given that Joshua Glazier had never created bank accounts for the Descendant's Trusts, all of the Descendant's Trusts' assets were necessarily commingled with other accounts.

B.  Eliminating the AJJ Trust's Partnership Interests

77.     Joshua Glazier also wanted to ensure that he did not have to share future profits with the AJJ Trust and its beneficiaries.

78.     Joshua Glazier did so by using his powers as Trustee to purportedly eliminate or drastically reduce the AJJ Trust's partnership interests in the Birds, and giving the AJJ Trust's share to himself or his business partner, Abdo.

79.     Although Joshua Glazier's attempts to eliminate or reduce the AJJ Trust's interest in the Birds were legally ineffective, once he made the purported change, he distributed the Birds' earnings that should have gone to the AJJ Trust to the other partners instead (himself or Abdo), as if the AJJ Trust was no longer a partner or was a reduced partner. He thereby deprived the AJJ

Trust of earnings to which it was legally entitled, and increased the earnings of Abdo, the JMG Trust and, on occasion, himself.

80.     Thus, Joshua's Glazier's actions harmed the AJJ Trust, of which he was the Trustee, while directly benefiting himself and Abdo.

81.     By 2011, Joshua Glazier had wrongfully "eliminated" the AJJ Trust's interest in every Bird.   No consideration was conveyed to the AJJ Trust in exchange for purportedly relinquishing its interests in any of the Birds.

82.     Joshua Glazier used two methods to attempt to eliminate the AJJ Trust's interest from the Birds:  (1) he purported to restate and/or amend the partnership agreement to change each partner's interest; and (2) he simply declared the AJJ's Trust interest as zero on tax returns, without attempting to modify the partnership agreement.

### i.     *"Restated" Partnership Agreements*

83.     To reduce or eliminate AJJ Trust's interest, without ever informing Adriane, Joshua Glazier purported to amend or restate the partnership agreements for Blue Jay, Eagle, and Sandpiper.

84.     Joshua Glazier attempted to alter the Birds' partnership agreements even though none of the agreements provides a mechanism for expelling a partner.  Indeed, the agreements expressly require the AJJ Trust to remain a partner through at least 2030.  In addition, Illinois law did not allow Joshua Glazier's attempted expulsions of the AJJ Trust.

85.     By attempting to effect these restatements, Joshua Glazier intended to, and did, benefit himself and his business partner Abdo while harming the AJJ Trust.

86.     In the Blue Jay "restated agreement," dated February 2002, Joshua Glazier eliminated the AJJ Trust's interest in the partnership altogether.   He distributed the shares

originally held by the AJJ Trust shares to Abdo and himself. He also changed the partnership

shares so that he, individually, received the shares—instead of the JMG Trust.

87. In the Eagle "restated agreement," Joshua Glazier eliminated the AJJ Trust's 45%

interest in the partnership entirely. He increased Abdo's interest by 30% and the JMG Trust's

interest by 15%.

88. The Sandpiper "restated agreement," dated as of February 1, 2000, reduced the AJJ

Trust's interest from 24.5% to 15% (with the exception of its interest in one Sandpiper property),

and gave that interest to Abdo.

89. Neither the Blue Jay, Sandpiper, nor the Eagle restated agreements were filed with

the Illinois Secretary of State.

90. As a result of the purported restatements, hundreds of thousands of dollars that

rightfully belonged to the AJJ Trust were not paid to the AJJ Trust.

91. Because none of the restatements comports with the requirements of the Illinois

Revised Partnership Act (indeed, only one is even executed) and/or the express terms of the

partnership agreements themselves, the restatements are not legally effective.

92. Furthermore, Joshua Glazier's attempt to surreptitiously deprive the beneficiaries

of their interests in the Birds for his own benefit constituted self-dealing and a breach of his

fiduciary obligations as a Trustee.

93. The AJJ Trust continues to own partnership interests in each of the Birds and is

entitled to its proportionate share of the earnings of Blue Jay, Eagle and Sandpiper from the time

period after the purported restatements, just as it was entitled to them prior to the purported

restatements – all of which earnings Joshua Glazier has wrongfully withheld.

94.     Until February 2020, Adriane was (a) never informed of the existence of the Bird partnership agreements, (b) never informed that her father had established and funded the Birds; (c) never informed that the AJJ Trust was a limited partner in the Birds; (d) never informed of the purported restatements to the Bird partnership agreements; and (e) never saw the original partnership agreements, restatements, or tax returns for the Birds.

### ii. Tax Returns

95.     For other partnerships in which no restatement was even drafted (Cardinal, Dove and Condor), Joshua Glazier attempted to exclude the AJJ Trust by reporting the AJJ Trust's interest in those partnerships as "0.00%" on their tax returns, after years of the AJJ Trust paying taxes on those partnerships' earnings commensurate with its stated interests.

96.     Joshua Glazier's conduct was intended to cut the AJJ Trust out of proceeds from the sale of real estate held by the Birds.  That is, Joshua Glazier would reduce the AJJ Trust's reported interest in a Bird to 0.00% on its tax return shortly before, or in the next return filed after, selling a Bird property, so that he did not have to share the sale proceeds with the AJJ Trust and so the IRS would not question why the AJJ Trust – a longtime partner in that entity – had not reported income from the sale.  In other words, Joshua Glazier caused the AJJ Trust to report and pay its share of taxes on annual rental income, which he retained, and then excluded the AJJ Trust from any share of the gains when the same property was sold.

97.     The AJJ Trust has at all times owned a limited partnership interest in each of the Birds.

98.     Joshua Glazier used this tax return scheme repeatedly—at least eight times—to steal sale proceeds that belonged to the AJJ Trust.

99.     For example, the 2004 Blue Jay partnership income tax return, filed by Joshua Glazier on or before July 15, 2005, listed the AJJ Trust as a 16% partner.  On July 8, 2005, the Blue Jay partnership sold a property located at 2353 183rd Street.  Despite having declared under oath in the 2004 Blue Jay tax return that the AJJ Trust was a 16% partner virtually contemporaneously with the sale of the 183rd Street property, in preparing the Blue Jay tax return for 2005, which was due to be filed on or before April 17, 2006, Joshua Glazier listed the AJJ Trust's interest in Blue Jay as 0%.  The 2005 tax return reported that the entire AJJ Trust interest had been transferred to Abdo notwithstanding a lack of any compensation to the AJJ Trust.  The AJJ Trust never received any portion of the $306,766 reported gain from the sale of the 183rd Street property.

100.     As another example, Bob purchased a property located at 5601 S. Harlem on October 19, 1998 ("5601 Harlem") through Condor, in which the AJJ Trust was a 49% partner. The AJJ Trust was listed as a Condor partner on every Condor tax return starting in 1999, and was taxed on its share of net annual income.  The Condor 2010 tax return was due to be filed by September 15, 2011 and that return listed the AJJ Trust as a 49% partner.  Just three months later, on December 11, 2011, Joshua Glazier sold 5601 Harlem, resulting in a net profit of approximately $600,000.  On Condor's 2011 tax return, filed after the sale, Joshua Glazier listed the AJJ Trust's interest as 0% and increased the JMG Trust's interest from 44% to 93%.  As a result of the unlawful change, Joshua Glazier gave himself the AJJ Trust's share of the 5601 Harlem net gain on sale, which totaled more than $300,000.

101.     Joshua Glazier, as the President and CEO of the Birds' general partner, Glazier Corp., was responsible for filing the Birds' tax returns, and changed the AJJ Trust's interests

without informing Adriane.  The AJJ Trust never received consideration for its alleged transfer of its interests, nor was Adriane consulted or informed about these purported transfers.

C.   Filing Tax Returns That Falsely Reported He Had Paid the AJJ Trust

102.    In an effort to conceal his conversion of AJJ Trust funds, Joshua Glazier falsely reported on the various HGB Partnership and AJJ Trust tax returns he filed that the income due to the AJJ Trust from the HGB Partnerships had been distributed to the AJJ Trust.  Further, he claimed distribution deductions of those amounts, allowing him to falsely lower the taxes due.  He did this even though he had not, in fact, made the distributions.

103.    As Trustee of the AJJ Trust and of the Adriane Trust, Joshua Glazier caused tax returns and forms to be filed for each trust for each year he was Trustee.  Additionally, as President and CEO of Glazier Corp., the general partner of each HGB Partnership, Joshua Glazier caused the filing of each HGB Partnership's tax return for the years they existed.  Joshua Glazier signed each return/form and filed them by sending them by U.S. mail from Illinois to the IRS Service Center in Cincinnati, Ohio, or by e-filing them from Illinois, which used interstate wires to deliver them to the Martinsburg Computing Center in Kentucky.

104.    In each tax return, Joshua Glazier attested that he had examined the return and found it to be true, correct and complete.  That declaration was willfully false in every return because the tax returns included information that Joshua Glazier knew to be false.

105.    With regard to the AJJ Trust's tax returns, the amounts Joshua Glazier reported as net taxable income that had been distributed to the AJJ Trust were false, in that Joshua Glazier had retained and converted all, or in some years most, of that income, as described *supra* in Paragraphs 67-75, making that income taxable to him and/or Glazier Corp., not to the AJJ Trust, the Adriane Trust, or Adriane personally.

106.    In the AJJ Trust's Form 1041s filed in 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007 and 2008, Joshua Glazier reported that the AJJ Trust had distributed income to the Adriane Trust in those years.  Each of these tax returns was false because no separate financial account for the Adriane Trust had ever been established.

107.    Moreover, in the AJJ Trust's Form 1041s for the years 2009, 2010, 2011, 2012 and 2013, Joshua Glazier reported that the AJJ Trust had distributed income to Adriane personally. Each of these tax returns was false because the AJJ Trust had made no distributions to Adriane or the Adriane Trust in these years.

108.    Leaving aside distributions made in 2006, 2007 and 2021, no other distribution has ever been paid to the Adriane Trust or to Adriane directly.

109.    In the HGB Partnerships' returns, Joshua Glazier reported that significant distributions had been made to the AJJ Trust, such as proceeds following the sale of properties. Yet, the AJJ Trust rarely received the full amount that Joshua Glazier reported on the returns.  In fact, in most cases, the AJJ Trust received *none* of the amounts Joshua Glazier reported had been distributed.

110.    In both the AJJ Trust's returns and the HGB Partnerships' returns, Joshua Glazier materially understated the income of the respective entity because Joshua Glazier reported as an expense item management fees that he unlawfully and improperly charged, as described more fully in Paragraphs 113-123 below.

111.    Finally, Joshua Glazier intentionally caused Adriane to personally pay income taxes on money he had retained for his or Glazier Corp.'s use.  For the tax years 2009, 2010, 2011, 2012, and 2013, Joshua Glazier reported to the IRS that he had made taxable distributions to Adriane personally, even though he had not done so.  Adriane was therefore responsible for paying

taxes for those amounts reflected on the K-1s notwithstanding the fact that she never received any amount in those years. Rather, those funds allegedly distributed to Adriane were actually retained by Joshua Glazier, converted to his own use for business investment or personal use. When he sent Adriane the K-1s reflecting distributions to her personally in 2009, 2010, 2011, 2012 and 2013, Joshua Glazier knew that Adriane had not received the distributions, because, as the Trustee, he knew that the AJJ Trust had not made any distributions in those years.

112. Thus, Joshua Glazier knowingly caused Adriane to pay income tax on money he, rather than she, had actually received, and on which he should have paid the taxes.

D. Paying Himself Excessive Management Fees, Which Joshua Glazier Actively Concealed from Adriane.

113. From 1998 through 2017, Joshua Glazier paid himself, Glazier Corp. and/or other companies or persons with whom he was affiliated management fees in excess of $3 million from the HGB Partnerships. The aggregate amount of fees charges is exorbitant and, on an annual basis, the fees repeatedly and grossly exceeded market rates for such services.

114. Joshua Glazier caused the HGB Partnerships to pay these exorbitant management fees notwithstanding the fact that such fees were barred by the governing partnership agreements.

115. All of the Bird partnership agreements contained language specifying that no administrative or management fees are payable to the General Partner so long as Abdo was working on the projects. *See supra* Paragraph 42(b).

116. Knowing such fees amounted to wanton self-dealing that violated his fiduciary duties to the AJJ Trust, the Descendant's Trusts, and their beneficiaries – as well as Glazier Corp.'s fiduciary duties as a general partner – Joshua Glazier undertook extensive efforts to conceal these fees. For decades, he failed to disclose to Adriane that he was paying himself management fees, and in fact, he repeatedly stated that he was *not* taking fees. On several occasions, Joshua Glazier

delineated items on which the AJJ Trust's, Hutchinson's and GlazCo's earnings were being spent, always deliberately omitting any mention of the management fees he was paying himself, his company or his affiliates.

117.    On January 14, 2012, Joshua Glazier sent an email to the Beneficiaries purporting to explain the expenses for a property owned by Hutchinson (5469 W. North Avenue).  Joshua Glazier deliberately omitted any mention of the management fees he paid himself.  In fact, from 1998 to 2018, Joshua Glazier had been paid more than $600,000 in management fees on the 5469 W. North Avenue property alone—more than 20% of the property's gross rental income. Additionally, in the same time period, Joshua Glazier, through Hutchinson, charged an additional management fee of nearly $500,000 that was not connected to any of the four Hutchinson properties.

118.    On information and belief, third-party property managers would typically charge less than $1,000 a month to manage the types of properties owned by the HGB Partnerships.  By any measure, the management fees charged by Joshua Glazier and/or his affiliates were excessive and violative of several legal duties Joshua Glazier owed the AJJ Trust and the HGB Partnerships.

119.    On June 16, 2015, Joshua Glazier falsely stated in an email he sent to the Beneficiaries that he had been "suspending" management fees that he was purportedly entitled to. In August 2015, during a meeting with the Beneficiaries and Adriane's now-husband, Joshua Glazier falsely stated that he had never taken management fees, a claim he repeated in a February 17, 2016 email.

120.    On May 15, 2017, Joshua Glazier emailed Adriane, finally admitting he had paid himself management fees–but claiming he had only charged $25,000 in each of 2015 and 2016 for

managing the properties held by GlazCo and Hutchinson, plus an additional $25,000 to deal with a roof collapse.

121.    In fact, the 2015 tax returns report that Hutchinson paid management fees of $58,000 and GlazCo paid management fees of $46,000, a total of $104,000, which went to Joshua Glazier or his affiliates.  Together, this represents more than 48% of the total rental income for those partnerships for that year, and more than *four times* the $25,000 Joshua Glazier reported to Adriane.

122.    The 2016 tax returns report that Hutchinson paid management fees of $60,000 and GlazCo paid management fees of $85,000, a total of $145,000, which went to Joshua Glazier or his affiliates.  Together, this represents more than 43% of the total rental income the partnerships earned, and nearly *three times* the $50,000 he had reported to Adriane.

123.    Moreover, at the time Joshua Glazier sent the May 15, 2017 email, Joshua Glazier was still concealing that the AJJ Trust was a partner in the Birds, and thus omitted any reference to the significant management fees he was also charging the Birds–$80,000 in 2017 alone, and more than $1 million from 1998-2018.

E.   Concealing His Wrongdoing Through Material Misstatements

124.    To prevent Adriane from discovering his wrongdoing, Joshua Glazier intentionally and repeatedly made material misrepresentations to Adriane.  Joshua Glazier's lies, described more fully below, had one overriding purpose: to allow Joshua Glazier to continue to retain the income and assets of the AJJ Trust for himself and/or Glazier Corp.  Joshua Glazier's misrepresentations and omissions were intended to, and did, induce Adriane not to further question his management of the AJJ Trust and HGB Partnership funds.

125.    In 2008, in the midst of the Great Recession, Adriane was a single mother who was concerned about her financial stability.  She emailed Joshua Glazier in May 2008 to ask him what support she could receive from the AJJ Trust.  Joshua Glazier responded and falsely told Adriane that he "was not holding any funds for her at this time" – even though the AJJ Trust had earned millions of dollars in income, one-third of which belonged to Adriane.  Joshua Glazier also refused to distribute income from the AJJ Trust to Adriane, despite his ability to do so under the Trust Agreement, which allowed him to make distributions when it was in Adriane's "best interest," which was to be "liberally construed" considering the "general financial resources and requirements of the beneficiary."

126.    During 2009, Joshua Glazier emailed Adriane several times reporting that the AJJ Trust had no income and could not provide her with any support.  This was false in that the AJJ Trust had earned significant income from its interests in the HGB Partnerships, and the AJJ Trust was intended to provide support to the three beneficiaries (including Adriane), via sharing the annual cash flow and profits created by the income from the HGB Partnerships.  Joshua Glazier frequently copied Jordan on these emails in an attempt to lend credence to his messages because Adriane was aware of Jordan's business success and financial acumen.

127.    In 2014, Adriane was again deeply concerned about her ability to support her children as they started college.  When she asked Joshua Glazier about the AJJ Trust, he told her the AJJ Trust was worth a tiny fraction of what it actually was, claiming that the AJJ Trust's total net value was $661,258, and again refused her request for a distribution to help her cover pressing expenses, including her daughter's college tuition and repairs to her condominium following a severe winter storm.

128.     In late 2014 and 2015, Joshua Glazier, for the first time, presented documents that purported to summarize the AJJ Trust's history and holdings.  In those documents, Joshua Glazier deliberately omitted any reference to the Birds and to other properties in which the AJJ Trust had an interest.  He also consistently (a) under-reported the income the HGB Partnerships earned, (b) omitted or vastly understated the amount he had paid himself or his affiliates in management fees, and (c) falsely claimed that the AJJ Trust was indebted to him.

129.     Joshua Glazier also repeatedly claimed that he had made deposits to the AJJ Trust as "gifts".  That, again, was a knowing lie:  the deposits he referenced were income from the Birds.  As a limited partner in the Birds, the AJJ Trust was entitled to its proportionate share of the Birds' income.  Thus, the deposits were not "gifts," but, as Adriane first discovered in February 2020, the deposits were income rightfully belonging to the AJJ Trust.  Joshua Glazier's intent in making such claims was to conceal the AJJ Trust's interest in the Birds and any resulting entitlement to proceeds from the sale of Bird properties, and to induce Adriane—whom Joshua Glazier knew was experiencing financial hardship—to not question his purported disclosures concerning the AJJ Trust's finances.

130.     In August 2015, Adriane, Jordan, Joshua Glazier, and Adriane's husband met in person at Adriane's home.  Joshua Glazier opened the meeting by acknowledging "the story has changed," and blamed that on faulty recollections.  Nonetheless, he was far from transparent about the AJJ Trust's holdings and finances.  At the conclusion of the meeting, Jordan promised on behalf of himself and Joshua Glazier that a full and complete reconciliation and accounting of the AJJ Trust's finances since its inception would be completed as soon as the two remaining properties held by the HGB Partnerships were sold.

131.     Jordan attempted to fulfill his promise by hiring Michael Eggert.  However, as explained above, a full and complete reconciliation was never provided–and could not have been provided–by Eggert.  Joshua Glazier subsequently disavowed the Eggert Report.  To the present date, Joshua Glazier still has not provided anything to the Beneficiaries that would constitute a valid accounting as required by the AJJ Trust and Illinois law.

## COUNT I
### Breach of Fiduciary Duty
### (Against Defendant Joshua Glazier)

132.     Plaintiff states and incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 131 above.

133.     As Trustee, Joshua Glazier owed the AJJ Trust and the Descendant's Trusts, and their beneficiaries, fiduciary duties.  Joshua Glazier was obligated to abide by the terms of the trust agreements, act with fidelity and good faith, serve the beneficiaries' interests with complete loyalty, and refrain from dealing with the trust property for his individual benefit.

134.     As described herein, Joshua Glazier breached his fiduciary duties by, *inter alia*:

    a.  Exploiting his position as Trustee of the AJJ Trust to benefit himself and Glazier Corp., the company he has controlled since approximately 1998;

    b.  Consistently acting to enrich himself and Glazier Corp. at the expense of the AJJ Trust, the Adriane Trust and Adriane;

    c.  Commingling the accounts of the AJJ Trust with, at minimum, the accounts of Glazier Corp. and his personal accounts;

    d.  Failing to maintain any bank accounts for each of the Descendant's Trusts;

    e.  Failing to disclose to Adriane information relevant to the AJJ Trust, including its holdings, partnership interests, annual accountings, and the payment of management fees to himself, Glazier Corp. and/or other entities that Joshua Glazier controlled;

    f.  Concealing and converting for his own and/or Glazier Corp.'s use rental income and sale proceeds from real estate in which the AJJ Trust had an interest;

g.   Surreptitiously decreasing or eliminating the AJJ Trust's interest in the Birds while increasing the interest of himself, JMG Trust, and Abdo, which harmed the AJJ Trust, the Adriane Trust and Adriane, and benefited Joshua Glazier and Glazier Corp.;

h.   Paying himself or companies he controlled exorbitant management fees from the HGB Partnerships;

i.   Failing to distribute income to the AJJ Trust, Adriane Trust or Adriane, which he claimed had been distributed on federal income tax returns and on which the AJJ Trust, Adriane Trust or Adriane personally was forced to pay taxes;

j.   Filing false tax returns;

k.   Failing to follow the Trust Agreement's requirements for sharing duties and decision-making with a co-trustee;

l.   Failing to appoint and enable a functioning successor co-trustee for the AJJ Trust;

m.   Abolishing the Descendant's Trusts in direct violation of the Trust Agreement; and

n.   Failing to keep accurate records of the AJJ Trust.

135.   As a direct and proximate result of Joshua Glazier's breaches of his fiduciary duties, the AJJ Trust and Plaintiff suffered substantial harm.

136.   By virtue of Joshua Glazier's breaches of his fiduciary duties, he deprived Adriane and the Adriane Trust of their share of millions of dollars that should have been paid to the AJJ Trust.  He also deprived the AJJ Trust of meaningful opportunities to reinvest and profit from the use of those funds.

137.   This loss of additional investment opportunities has harmed the AJJ Trust.  By way of example, as reflected in the filed tax returns, the internal rate of return realized by the HGB Partnerships from 1997-2018 on a combined basis is approximately 77%.  The Beneficiaries could have and would have received the benefit of comparable returns if the AJJ Trust had received its rightful share of the HGB Partnerships' assets.

138.    As described herein, Joshua Glazier's breaches of fiduciary duties were intentional, fraudulent, malicious, willful, wanton, without just cause, and committed with intent to injure Plaintiff.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in her favor, and against Defendant Joshua Glazier, and award to Plaintiff: (1) compensatory damages in amount to be proven at trial but well in excess of $75,000; (2) disgorgement of all compensation paid to Joshua Glazier or entities that he controlled; (3) disgorgement of any profit Joshua Glazier made as a result of his breaches; (4) forfeiture of his 1/3 interest in the assets of the AJJ Trust;  (5) punitive damages in an amount to be determined at trial; (6) removal of Joshua Glazier as Trustee; (7) imposition of constructive trust on any trust assets improperly distributed to Joshua Glazier and/or Glazier Corp.; and (8) such other and further relief as this Court deems just and proper.

### COUNT II
### Participation in Breach of Fiduciary Duty
### (Against Defendant Abdo)

139.    Plaintiff states and incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 138 above.

140.    Abdo knew of the existence of the AJJ Trust and knew that Joshua Glazier served as Trustee of the AJJ Trust, and as such owed fiduciary duties to the AJJ Trust and its beneficiaries, including the duty to act in the AJJ Trust's best interest and to avoid self-dealing.

141.    Abdo participated in Joshua Glazier's breaches of his fiduciary duties to the AJJ Trust and its beneficiaries by decreasing the AJJ Trust's interests in the Birds.  Abdo knew that Joshua Glazier was decreasing or eliminating the AJJ Trust's interest in the Birds because Abdo, like the AJJ Trust, was a limited partner in each Bird.

142. Abdo appears to have signed the purported restated agreement for the Eagle Partnership in August 2007, which eliminated the AJJ Trust's interest in Eagle.

143. In connection with the Blue Jay tax return for 2005, Blue Jay filed IRS Form 8308, "Report of a Sale or Exchange of Certain Partnership Interests." On the IRS Form 8308, Abdo accepted a purported transfer of the AJJ Trust's interest in Blue Jay to himself. In so doing, Abdo overtly acted to help Joshua Glazier convert the AJJ Trust's entire interest in Blue Jay to Abdo's possession, leaving the AJJ Trust with 0% interest and increasing Ado's interest from 8% to 29%.

144. In connection with the Pelican tax return for 2005, Pelican filed IRS Form 8308, in which Abdo accepted a purported transfer of the AJJ Trust's interest in Pelican to himself. In so doing, Abdo overtly acted to help Joshua Glazier convert the AJJ Trust's 21% interest in Pelican to Abdo's and Joshua Glazier's possession, leaving the AJJ Trust with 0% interest and increasing Abdo's interest from 10% to 12%.

145. In connection with the Sandpiper tax return for 2005, Sandpiper filed IRS Form 8308, in which Abdo accepted a purported transfer of the AJJ Trust's interest in Sandpiper to himself. In so doing, Abdo overtly acted to help Joshua Glazier convert the AJJ Trust's 24.5% interest in Sandpiper to Abdo's possession, leaving the AJJ Trust with 15% interest and increasing Abdo's interest from 10% to 12%.

146. On information and belief, in each case, Abdo paid the AJJ Trust nothing for these purported "Sales or Exchanges" reported on the IRS Form 8308s.

147. On information and belief, Abdo was aware that Joshua Glazier had attempted to restate the other Bird partnership agreements and/or reported the AJJ Trust held 0% of the Birds on the tax returns. Abdo thus affirmatively assisted and helped conceal Joshua Glazier's breaches of fiduciary duty.

148.     Each time Joshua Glazier decreased or eliminated the AJJ Trust's share of the Birds, Abdo directly benefited because his proportionate share in the Bird increased.  As a result of his increased share, Abdo received increased shares of proceeds from property sales the Birds held, rental income from the Birds' properties, and/or other earnings from the Birds.  But for the improper reduction of the AJJ Trust's share in the Birds, Abdo would have received less money from the Birds.

149.     At no time did Abdo ever inform Adriane that Joshua Glazier was attempting to decrease and/or eliminate the AJJ Trust's share in the Birds.  His decision to stay silent was a willful and self-interested course of action.

150.     When Abdo acted to ratify the purported restated Bird partnership agreements, failed to stop Joshua Glazier from falsifying tax returns, and failed to inform Adriane, Abdo knew or should have known that Joshua Glazier's acts in decreasing the AJJ Trust's shares in the Birds amounted a breach of his fiduciary duties to the AJJ Trust and its beneficiaries.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in her favor, and against defendant Dan Abdo in amount to be proven at trial but well in excess of $75,000; disgorge any profit Abdo made as a result of his participation in the breaches; impose a constructive trust upon benefits received by Abdo; and grant such other and further relief as this Court deems just and proper.

## COUNT III
### Common Law Fraud
### (Against Defendant Joshua Glazier)

151.     Plaintiff states and incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 150 above.

152.     Joshua Glazier made numerous false statements of material fact and/or omissions

of material fact, including:

a.     Stating to Adriane in an email dated May 15, 2008 that Joshua Glazier "was not holding any funds for her at this time." Joshua Glazier's statement was false, in that he had retained millions of dollars of income belonging to the AJJ Trust, one-third of which Adriane was entitled to.

b.     Stating to Adriane in an email dated March 26, 2009 that he was "terminating some sub-trusts to the AJJ trust" because they were expensive to keep and there was not "much need to continue their existence." This statement was false and/or intentionally misleading because the "sub-trusts" Joshua Glazier referred to were the Descendant's Trusts, including the Adriane Trust, which the Trust Agreement unequivocally established and which he had no power to terminate.

c.     Stating to Adriane in an email dated April 15, 2009 that the AJJ Trust's $50,000 in income was spent entirely on "repayment of debt and property expenses." That statement was misleading and false because: (i) it understated the AJJ Trust's legitimate income; (ii) it omitted the approximately $118,000 distribution that Condor's tax returns showed Condor made to the AJJ Trust in 2008—which funds Joshua Glazier never transferred to the AJJ Trust or the Adriane Trust, but instead retained those funds; and (iii) it omitted any reference to the exorbitant management fees Joshua Glazier had paid himself.

d.     Stating to Adriane in an email dated October 19, 2009 that "there is no support built into Dad's estate. All of the funds from the bulk of the property sales were distributed a few years ago. . ." This statement was false because (i) not *all* funds owed to the AJJ Trust, the Adriane Trust, or Adriane from the property sales had been distributed (among others, none of the funds from the sale of Taco Bell, 6201 Clark, and Holy Cross Hospital were ever distributed, nor was the proper amount of the funds from the sale of properties held by Sparrow, Eagle, Cardinal, Dove and Sandpiper); and (ii) the AJJ Trust was intended to provide support to the three beneficiaries, via sharing the annual cash flow and profits created by the rental income from the HGB Partnerships.

e.     Stating to Adriane in an email dated July 15, 2014 that Adriane's one-third share of the AJJ Trust was valued at $325,000. This statement was false because it dramatically undervalued the AJJ Trust's value, which Joshua Glazier knew because he had converted millions of dollars belonging to the AJJ Trust to his and Glazier Corp.'s use.

f.     Providing a hand-drawn chart to Adriane during a November 8, 2014 meeting at Joshua Glazier's home, which contained misrepresentations regarding the AJJ Trust's history and holdings ("Holdings Chart"). In the Holdings Chart, Joshua Glazier deliberately omitted any reference to the Birds and to two properties

GlazCo had sold in 1998 and 1999, the proceeds from which the AJJ Trust should have received a portion but did not.

g.  Providing a document to Adriane during a November 8, 2014 meeting at Joshua Glazier's home, titled "Cash Flow Recap", which contained numerous misrepresentations, including the following: (i) it understated rental income for the properties at both North Avenue and Ashland when compared to the federal tax returns submitted for Hutchinson and GlazCo; (ii) it omitted any reference to the nearly $2 million in management fees Joshua Glazier had already paid himself from the HGB Partnerships; (iii) its statements of the AJJ Trust's debt and assets were inconsistent with the 2014 and 2015 filed tax returns; (iv) it omitted any reference to the Birds; and (v) it showed that the AJJ Trust owed Joshua Glazier $304,566, when in actuality he was in debt to the AJJ Trust and the AJJ Trust owed him nothing.

h.  Explaining to Adriane in an email dated November 12, 2014 certain deposits to the AJJ Account, which contained numerous lies about those deposits, as further specified in Paragraph 180 below.

i.  Stating to Adriane and Adriane's now-husband during a meeting at Joshua Glazier's home (which Jordan attended by phone) on January 25, 2015: (i) he had no data available regarding revenue, rent, income or cash flow before 2003 from the Hutchinson properties (whereas in February 2020, he disclosed dozens of tax returns for those years); (ii) in 1999 he had distributed $60,000 to each AJJ Trust beneficiary from the sale of a property utilized by Holy Cross Hospital (Joshua Glazier knew no such distribution had been made, because he had converted all proceeds of the sale, and retained them); (iii) he had made gifts to the AJJ Trust of proceeds from properties the Birds owned, calling them "his own projects" (in fact, the AJJ Trust was legally entitled to the sale proceeds based on its partnership interest in the Birds); and (iv) he omitted any mention of two properties that GlazCo had owned in 1998 and 1999, a portion of the annual income and sale proceeds of which the AJJ Trust should have received but did not.

j.  Stating to Adriane in an email dated June 16, 2015 that he "never treated [himself] better than an arm's length party when dealing with the [AJJ] trust . . . [which] is an expensive one – for [him] and [his] family" and that "conducting audits" would result in "a material negative financial impact to [Adriane]." In reality, Joshua Glazier had profited handsomely from his position as Trustee, including by converting the AJJ Trust's funds for his own use as well as charging exorbitant management fees (as detailed above). He also claimed that he was "writing off $299,245 of trust expenses (see the 12-31-14 cash flow recap)," which he never did, and that he was "funding after-tax distributions to [Adriane] of $200,000 without repayment", which was a continued recitation of his false claim that the Bird property proceeds belonged to entirely him and not to the AJJ Trust.

k.  Stating to Adriane he was not paying himself management fees, including on June 16, 2015 falsely stating in an email sent to the Beneficiaries that he had been "suspending" management fees that he was purportedly entitled to.

l.  Stating to Adriane in an email dated June 19, 2015 that "[t]he advance of $200,000 to you of funds from non-AJJ projects was clearly and fully set forth in the AJJ Trust Brokerage accounts that I sent to you… So please go through them and cut me a check back for $200,000." That statement was false because the deposits were not gifts, nor were they from non-AJJ Trust projects. As Adriane later learned, those funds came from the Birds and since the AJJ Trust was a limited partner in the Birds, it was entitled to its proportionate share of any sale proceeds.

m.  Stating to Adriane in an email dated May 15, 2017 that he charged $25,000 in each of 2015 and 2016 for managing the properties held by GlazCo and Hutchinson, plus an additional $25,000 for an issue on a property. That statement was false because he had in fact charged far greater management fees as described in Paragraphs 120-123 above.

n.  Providing an updated version of the Cash Flow Recap captioned "Cash Flow Recap/1-1-1999 to 12/31/14" for the properties held by Hutchinson and GlazCo ("Updated Cash Flow Recap") to Eggert, who emailed it to Adriane on December 17, 2017, which contained the following false statements:  (i) it showed gross rents for the properties held by Hutchinson and GlazCo that were significantly understated as compared to the rental income reported in the tax returns; (ii) it showed all of the proceeds from the 1999 sale of the Holy Cross Hospital property as having been distributed to the AJJ Trust, even though no such distributions had been made; (iii) it showed that all of the Bird proceeds Joshua Glazier had deposited into the AJJ Account actually belonged to him, when in truth they belonged to the AJJ Trust; (iv) it showed Hutchinson and GlazCo owed Joshua Glazier $286,592— even though Joshua Glazier was not owed any such money. Indeed, Joshua Glazier confirmed he was not owed money in an email he sent to Adriane on December 2, 2014, in which he stated that he would consider himself "paid back" as of January 1, 2015.

153.  Given Joshua Glazier was Adriane's older sibling, his position as Trustee of the AJJ Trust and the Adriane Trust, and his business acumen, Plaintiff reasonably relied upon the purported veracity of Joshua Glazier's false statements to her.

154.  Plaintiff suffered damages as a result of her reasonable reliance on Joshua Glazier's false statements. Specifically, in her capacity as a beneficiary of the AJJ Trust, she was denied funds that should have been made available to her years ago. In addition, she paid taxes on K-1 distributions that were never made, as described in Paragraph 111 above.

155.    As described herein, Joshua Glazier's fraud was intentional, malicious, willful, wanton, without just cause, and committed with intent to injure Plaintiff.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in her favor and against Defendant Joshua Glazier, and award to Plaintiff: (1) compensatory damages in an amount to be proven at trial but well in excess of $75,000; (2) punitive damages in an amount to be determined at trial; and (3) such other and further relief as this Court deems just and proper.

### COUNT IV
### Violation of 18 U.S.C. Sec. 1962(c) (RICO)
### (Against Defendant Joshua Glazier)

156.    Plaintiff states and incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 155 above.

157.    This Count is brought pursuant to 18 U.S.C. § 1964(c) for violation of 18 U.S.C. § 1962(c).

158.    Joshua Glazier is a culpable person because he is an individual capable of holding a legal or beneficial interest in property.

159.    The AJJ Trust is a lawfully established legal entity engaged in and whose activities affected and affect interest commerce.  Glazier Corp. is a corporation engaged in and whose activities affected and affect interstate commerce.  As alleged above, the AJJ Trust was part of Bob's estate plan to invest in and hold real estate assets, and Glazier Corp. operated a boutique real estate development company and served as General Partner of all of the HGB Partnerships. Together, the AJJ Trust and Glazier Corp. operated as an association-in-fact enterprise.

160.    Joshua Glazier was associated with the AJJ Trust in his capacity as Trustee and beneficiary of the AJJ Trust and was CEO and President of Glazier Corp.  Utilizing his positions and authority, Joshua Glazier commingled the association-in-fact enterprise's assets, as alleged in Paragraphs 67-76 above.

37

161.    Beginning in 1998 and continuing through the present, the association-in-fact enterprise has existed and operated in concert for the unlawful purpose of intentionally defrauding Adriane, as a beneficiary of the AJJ Trust and the Adriane Trust, of money and property. Joshua Glazier, as Trustee of the AJJ Trust and President and CEO of Glazier Corp., has conducted and participated in the conduct of the association-in-fact enterprise's affairs through a pattern of racketeering activity, set forth in detail below, to facilitate the association-in-fact enterprise's unlawful purpose and for the purpose of enriching himself and his affiliates.

162.    Beginning in 1998 and continuing through the present, Joshua Glazier, using his authority as AJJ Trust's Trustee and Glazier Corp.'s CEO and President, in conducting the affairs of the association-in-fact enterprise's affairs, has devised and executed multiple interrelated schemes to defraud the AJJ Trust, the Adriane Trust, Adriane, and other possible beneficiaries, of money and property by means of false and fraudulent representation, pretenses and promises. In furtherance of his schemes, Joshua Glazier used and caused the use of the United States mail and Interstate Wire Communications in violation of 18 U.S.C. Sections 1341 and 1343. All emails described in the predicate acts below constituted interstate wire communications not only because they involved a sender and recipient in different states, as set forth in detail herein, but also because the transmission of the emails involved internet servers located in multiple states.

163.    Joshua Glazier's schemes included: embezzling, stealing, and converting the income and assets of the AJJ Trust and the Adriane Trust for the benefit of himself and Glazier Corp., as further specified in Paragraphs 67 to 76 above (the "Conversion Scheme"); eliminating or curtailing the AJJ Trust's true partnership interests in the Birds in order to increase his or his affiliates' stake in those partnerships, as further specified in Paragraphs 77 to 101 above (the "Birds Scheme"); filing false tax returns in furtherance of the above schemes and to benefit Joshua Glazier

by various means, as further specified in Paragraphs 102 to 112 above (the "Tax Returns Scheme"); paying himself and his affiliates exorbitant and unlawful management fees in violation of the particular partnership agreements and provisions of law, as further specified in Paragraphs 113 to 123 above (the "Management Fees Scheme"); and concealing his wrongdoing through a parade of new lies to Adriane and others as further specified in Paragraphs 124 to 131 above (the "Concealment Scheme").

164.     Pursuant to and in furtherance of his schemes, Joshua Glazier committed multiple acts indictable as wire and mail fraud, transporting stolen goods in interstate commerce, conducting financial transactions in property derived from specified unlawful activity, and witness tampering in violation of Sections 1341, 1343, 1512, 1957 and 2314 of Title 18 of the U.S. Code.

165.     Joshua Glazier, as Trustee of the AJJ Trust and President and CEO of Glazier Corp., directly and indirectly conducted and participated in the conduct of the association in fact enterprise's affairs through the pattern of racketeering and activity described herein, in violation of 18 U.S.C. Section 1962(c).

166.     Joshua Glazier's schemes, and the Concealment Scheme in particular, prevented Adriane from discovering that Joshua Glazier had committed multiple indictable acts and that she had been injured from those acts.  It was not until February 2020, when Joshua Glazier produced to Adriane hundreds of documents, that she first could have reasonably discovered her potential RICO injury as alleged herein.

167.     The acts set forth below, committed and caused by Joshua Glazier as the Trustee of the AJJ Trust and CEO and President of Glazier Corp., constitute a pattern of racketeering activity pursuant to 18 U.S.C. Section 1961(5).

**Predicate Act One**

168.    On or about May 10, 2000, Joshua Glazier, in furtherance of the above-alleged schemes to defraud, particularly the Conversion Scheme and the Tax Return Scheme, caused the Hutchinson 1999 IRS Form 1065 Income Tax Return to be filed with the Internal Revenue Service by use of the United States mail, on which return Joshua Glazier falsely stated that the AJJ Trust had received from Hutchinson distributions of money in the form of cash or marketable securities in the amount of $416,555, whereas in truth and fact Joshua Glazier had converted those funds, retaining them in Glazier Corp.'s accounts for the use of himself and/or Glazier Corp.; all in violation of 18 U.S.C. § 1341.

**Predicate Act Two**

169.    Beginning in July 2002, in furtherance of Joshua Glazier's schemes to defraud, and in particular the Birds Scheme, Joshua Glazier took the following actions: on July 31, 2002, Joshua Glazier caused the sale of a property owned by Sandpiper at 999 Waukegan Road in Glenview Illinois, which sale yielded a capital gain of $509,890 to Sandpiper.  Although Sandpiper's 2002 income tax return, IRS Form 1065, stated that the AJJ Trust was a 24.5% partner in Sandpiper, the following day, on August 1, 2002, Joshua Glazier caused only $84,750 (which is 16.6% of the capital gain) to be deposited to the AJJ Account.  Thereafter, on or before October 15, 2003, Joshua Glazier falsely reported on the 2002 Sandpiper income tax return on the AJJ Trust's K-1, which he caused to be sent by United States mail to the Internal Revenue Service Center in Cincinnati, Ohio, that Sandpiper had made a distribution of money in the form of cash or marketable securities in the amount of $152,550 to the AJJ Trust in 2002, well knowing that statement was untrue; all in violation of 18 U.S.C. § 1341.

**Predicate Act Three**

170.     In or about April 2006, in furtherance of the above-alleged schemes to defraud and, in particular, the Birds Scheme, including Paragraph 99 above concerning Blue Jay, Joshua Glazier caused Blue Jay's 2005 IRS Form 1065, which falsely reported the AJJ Trust's partnership interest as 0.0000%, to be sent to the IRS Service Center in Cincinnati, Ohio by United States mail, in violation of 18 U.S.C. § 1341.

### Predicate Acts Four to Six

171.     On November 11, 2006, all funds in the AJJ Account represented funds legitimately due and owing to the AJJ Trust from prior operations.  Notwithstanding that, on that date, Joshua Glazier withdrew $129,000 from the AJJ Account and caused it to be sent by wire transfer to himself, and purchased for Eagle a property at 8100 S. Western ("8100 S. Western").  All Eagle tax returns, IRS Form 1065, from 1999 to 2005, reported the AJJ Trust as at least a 45% partner in Eagle, including the return filed on or before April 17, 2006, which reported the AJJ Trust as holding 50% of the partnership.  Despite that, and despite taking $129,000 directly from the AJJ Account the day he purchased 8100 S. Western, Joshua Glazier caused the 2006 Eagle income tax return, IRS Form 1065 to be filed listing the AJJ Trust's interest in Eagle as 0.000000000%, while on that form Abdo's interest was increased from 5% to 25%, and Joshua Glazier's interest increased from 44% to 74%.  The conduct described in this paragraph constituted several indictable acts, namely:

### Predicate Act Four

172.     Joshua Glazier's withdrawal of $129,000 from the AJJ Account on November 11, 2006 violated 18 U.S.C. § 1957, in that it was a monetary transaction, a withdrawal from a financial institution, taking place in the United States, and constituting criminally derived property, that is money he knew he was embezzling, converting and stealing from the AJJ Trust, and derived from

a specified unlawful activity, that is his ongoing schemes to defraud the AJJ Trust, further alleged above, including the Conversion Scheme and the Birds Scheme;

## Predicate Act Five

173.    Joshua Glazier's transmission of the above-described $129,000 via wire transfer on or about November 11, 2006 violated 18 U.S.C. § 2314 in that he transported in interstate commerce money of a value exceeding $5,000, knowing those funds were stolen, converted and taken by fraud;

## Predicate Act Six

174.    Joshua Glazier's filing of the 2006 Eagle income tax return that falsely reported the AJJ Trust as a 0.00000000% partner violated 18 U.S.C. § 1341, in that it was sent by United States mail on or before April 17, 2007 to the Internal Revenue Service Center in Cincinnati, Ohio in furtherance of Joshua Glazier's above-described schemes, particularly the Conversion Scheme, the Birds Scheme, and the Tax Return Scheme.

## Predicate Act Seven

175.    In 2007, Joshua Glazier caused the sale through Cardinal of three properties that had been originally purchased by other Birds in which the AJJ Trust had the following interests at the time: (a) 6059 S. Ashland, purchased by Dove in May 2001, in which the AJJ Trust held a 28.5% interest; (b) 6301 S. Cermak, purchased by Sandpiper in July 2001, in which the AJJ Trust held a 24.5% interest; and (c) 6230 S. Ashland, purchased by Dove in June 2000, in which the AJJ Trust held a 28.5% interest. In transferring those properties to other partnerships and ultimately to Cardinal (in which the AJJ Trust became a 21% partner in 2002), Joshua Glazier consistently sought to reduce the AJJ Trust's interest in these properties and in Cardinal, and paid into the AJJ Account, in connection with Cardinal's sale of these and other properties in 2007, hundreds of

thousands of dollars less than the AJJ Trust was actually entitled to. In or about October 2008, in furtherance of the Birds Scheme and the Conversion Scheme, Joshua Glazier caused the Cardinal 2007 IRS Form 1065 to be sent by United States mail to the Internal Revenue Service Center in Cincinnati, Ohio, which Form 1065 falsely reported on the AJJ Trust's K-1 that the AJJ Trust had earned only $240,520 from Cardinal in 2007, whereas in truth the AJJ Trust had earned hundreds of thousands of dollars more from the 2007 property sales; all in violation of 18 U.S.C. § 1341.

## Predicate Act Eight

176. On March 26, 2009, in furtherance of the above-described schemes to defraud, including the Tax Return Scheme, the Conversion Scheme and the Concealment Scheme, Joshua Glazier sent an interstate wire communication in violation of 18 U.S.C. § 1343, namely an email to Adriane and Jordan, which stated that he was "terminating some sub-trusts to the AJJ trust that cost several hundred $$ each year to keep without much need to continue their existence . . . So I was hoping that we could each pay our share to save some money." Joshua Glazier made these statements well knowing they were false in that: (i) the existence of the so-called "sub-trusts," the Descendants' Trusts, was specifically mandated by the AJJ Trust Agreement and they could not be terminated, as further specified in Paragraph 152(b) above; and (ii) the only person who would save money by having the AJJ Trust beneficiaries, especially Adriane, pay her taxes directly without the benefit of any distribution from the AJJ Trust was Joshua Glazier, because doing so enabled him to retain even more of the AJJ Trust income that he had converted. Joshua Glazier's email utilized interstate wires in that he sent it from Illinois to Jordan in another state.

## Predicate Act Nine

177. On October 19, 2009, in furtherance of his schemes to defraud the AJJ Trust, including the Conversion Scheme and the Concealment Scheme, Joshua Glazier sent an interstate wire communication in violation of 18 U.S.C. § 1343, namely an email to Adriane and Jordan,

falsely stating "there is no support built into Dad's estate. All of the funds from the bulk of the property sales were distributed a few years ago. . ." well knowing those statements were false for the reasons set forth above in Paragraph 152(d). Joshua Glazier's email utilized interstate wires in that he sent it from Illinois to Jordan in another state.

### Predicate Act Ten

178.    On January 14, 2012, in furtherance of his above-alleged schemes to defraud, particularly the Management Fee Scheme and the Concealment Scheme,  Joshua Glazier sent an interstate wire communication in violation of 18 U.S.C. § 1343, namely an email to Adriane and Jordan, in which he deliberately concealed the unlawful management fees he was paying himself, stating with regard to 5469 W. North Avenue:  "So far the cash flow from that property is being spent on paying the interest and principal on the loan and other associated expenses, such as income taxes, etc.," well knowing that in 2011 alone he had paid $36,000 in management fees to himself and his affiliates, more than 25% of the gross rental income from that property.  Joshua Glazier's email utilized interstate wires in that he sent it from Illinois to Jordan in another state.

### Predicate Act Eleven

179.    On or before September 17, 2012, in furtherance of his above-alleged schemes to defraud  and, in particular, the Conversion Scheme and the Birds Scheme, including Paragraph 100 above concerning Condor, Joshua Glazier caused the filing of the 2011 Condor IRS Form 1065, which falsely reported the AJJ Trust's partnership interest as 0.0000%, by means of interstate wire communication, namely electronic filing of the Form 1065 at the IRS Processing Center in Martinsburg, Kentucky, in violation of 18 U.S.C. § 1343.

### Predicate Act Twelve

180.    On November 12, 2014, in furtherance of his schemes to defraud the AJJ Trust, particularly the Birds Scheme, the Conversion Scheme and the Concealment Scheme, Joshua

Glazier sent an interstate wire communication in violation of 18 U.S.C. § 1343, that is an email to

Adriane and Jordan, which stated in relevant part:

> I received statements for the AJJ Brokerage account back to when I opened it in 2001.. .
>
> After looking through the statements, all I can say is that I'd like an older brother like me. It looks like I deposited over $1,050,000 to the trust account from my own projects over the years, in addition to anything that Dad intended for the trust to benefit from.
>
>  These projects were done after he passed away. I made these payments for my own sentimental reasons, and if you couldn't tell, I actually forgot most of them until I just reviewed the account summaries. I think that continuing the trust's involvement let me feel that Dad was still around.

Joshua Glazier's email utilized interstate wires in that he sent it from Illinois to Jordan in another

state. Many of these statements were made by Joshua Glazier knowing they were false, including:

a. The $1,050,000 deposited to the AJJ Account was not from Joshua Glazier's "own projects," but rather from the Birds, in which the AJJ Trust had been a partner since Bob formed them in 1998;

b. The projects were not all "done after [Dad] passed away;" Eagle and Condor properties were purchased while Bob was alive, and Bob had in fact advanced funds to all six original Birds at the time of his death;

c. Joshua Glazier did not "ma[k]e these payments for my own sentimental reasons" or because "continuing the trust's involvement let me feel that Dad was still around." He made these payments because the AJJ Trust was a partner in each of the projects from which the income derived and the money paid was lawfully due and owing to the AJJ Trust; and

d. Joshua Glazier did not forget about the payments into the AJJ Account; he had been actively hiding the terms of the Bird partnership agreements from Adriane for years.

## **Predicate Act Thirteen**

181.   On January 25, 2015, in furtherance of his above-alleged schemes to defraud,

including the Conversion Scheme, the Birds Scheme and the Concealment Scheme, Joshua Glazier

caused an interstate wire communication in violation of 18 U.S.C. § 1343, namely a telephone

conference call from his home in Illinois that included him, Adriane and Adriane's now-husband,

and Jordan in another state, in which Joshua Glazier made numerous false statements set forth in detail in Paragraph 152(i) above.

### Predicate Act Fourteen

182.　On June 16, 2015, in furtherance of the above-alleged schemes to defraud and, in particular, the Management Fees Scheme and the Concealment Scheme, Joshua Glazier sent an interstate wire communication in violation of 18 U.S.C. § 1343, namely an email to Adriane and Jordan in which he falsely stated that he had been "suspending the various fees that [he was] entitled to for property and AJJ management," well knowing that by then the various partnerships in which the AJJ Trust held an interest had paid more than $2 million in management fees to Joshua Glazier and/or his affiliates and various partnership agreements specifically barred him from charging such fees. Joshua Glazier's email utilized interstate wires in that he sent it from Illinois to Jordan in another state.

### Predicate Act Fifteen

183.　On June 19, 2015, in furtherance of the above-described schemes to defraud, particularly the Birds Scheme and the Concealment Scheme, Joshua Glazier sent an interstate wire communication in violation of 18 U.S.C. § 1343, namely an email to Adriane and Jordan, falsely stating that he deposited $200,000 to the AJJ Trust as a "gift" to the AJJ Trust, knowing full well that the $200,000 was income from the Birds, which the AJJ Trust was entitled to as a limited partner of the Birds. Joshua Glazier's email utilized interstate wires in that he sent it from Illinois to Jordan in another state.

### Predicate Act Sixteen

184.　On May 15, 2017, in furtherance of the above-described schemes to defraud, particularly the Management Fees Scheme and the Concealment Scheme, Joshua Glazier sent an interstate wire communication in violation of 18 U.S.C. § 1343, namely an email from Illinois to

Adriane in New York and to Jordan outside of Illinois, in which he falsely stated he "charged $25,000 in each of 2015 and 2016 to manage the properties, plus an additional $25,000 to deal with the collapse" of the roof on Ashland Avenue, whereas, as further specified in Paragraphs 120-123 above, GlazCo and Hutchinson had paid Joshua Glazier and his affiliates nearly a quarter of a million dollars in management fees during those years.

### Predicate Acts Seventeen and Eighteen

185.    In 2017, in furtherance of the above-described schemes to defraud, particularly the Conversion Scheme, the Bird Scheme, and the Concealment Scheme, Joshua Glazier caused interstate wire communications in violation of 18 U.S.C. § 1343 concerning the Updated Cash Flow Recap, described above in Paragraph 152(n), namely the following emails: (a) an email on or about July 25, 2017 from himself in Illinois to Eggert in California, transmitting the Updated Cash Flow Recap, which Joshua Glazier had prepared and sent to Eggert intending and understanding that Eggert would base his Report on this document, which Joshua Glazier knew was false in several regards, as specified in Paragraph 152(n) above; and (b) an email on or about December 17, 2017, from Eggert in California to Adriane in Illinois, which attached a copy of the Updated Cash Flow Recap, as a document on which Eggert had relied in preparing his Report, which wire communication was foreseeable to Joshua Glazier, who understood that Eggert would send documents related to his work to Adriane, including by email.

### Predicate Act Nineteen

186.    On November 27, 2017, in furtherance of the above-alleged schemes to defraud, particularly the Conversion Scheme, the Birds Scheme, the Tax Returns Scheme and the Concealment Scheme, Joshua Glazier caused an interstate wire communication in violation of 18 U.S.C. § 1343, namely an email from Jordan outside of Illinois to Adriane in Illinois, among others, which attached an initial draft of the Eggert Report ("Eggert Draft Report").  Because Joshua

Glazier provided nearly all the information on which Eggert relied in preparing the Eggert Draft Report, and because Joshua Glazier had previously reviewed the Eggert Draft Report, he knew it contained multiple false statements in that Joshua Glazier had intentionally concealed from Eggert and Adriane the AJJ Trust's partnership interest in the Birds, among other properties, and the Eggert Report treated the Birds as Joshua Glazier's own investments, crediting none of the Bird earnings to the AJJ Trust. Joshua Glazier knew the Eggert Draft Report, which had been prepared in California, would be sent to Adriane outside California, and that the use of email to transmit that Eggert Draft Report was foreseeable.

## Predicate Act Twenty

187.    On August 17, 2018, in furtherance of the above-alleged schemes to defraud, and, in particular, the Conversion Scheme, the Birds Scheme, the Tax Return Scheme and the Concealment Scheme, Joshua Glazier caused an interstate wire communication to be sent in violation of 18 U.S.C. § 1343, namely an email from Eggert in California to Adriane in Illinois, among others, which attached the Eggert Report. Joshua Glazier, who had received prior drafts, knew that the Eggert Report contained false statements because Joshua Glazier had intentionally concealed from Eggert (as well as Adriane) the AJJ Trust's partnership interests in the Birds, which were treated in the Eggert Report as Joshua Glazier's own investments, and Joshua Glazier also had concealed the AJJ Trust's interest in other properties, including a GlazCo property at 6201 N. Clark. Joshua Glazier intended that the Eggert Report be transmitted to Adriane and knew the use of email was foreseeable.

## Predicate Act Twenty-One

188.    Beginning on or about October 10, 2018, Joshua Glazier engaged in acts of witness tampering in violation of 18 U.S.C. § 1512(b) when he knowingly and corruptly attempted to hinder, delay or prevent the communication to law enforcement officers of information relating to

the possible commission of federal offenses, including tax fraud, by engaging in the following conduct:

    a.   On October 10, 2018, Joshua Glazier had graduated from law school, was a member of the Illinois Bar, and had practiced law in Illinois.

    b.   On that date, Joshua Glazier emailed to Adriane a draft Agreement which he said he had written. In the Agreement, Joshua Glazier agreed to distribute certain funds to Adriane from the AJJ Trust, provided she released Joshua Glazier from "any and all Claims," with "Claims" defined to include all causes of action, "civil, criminal or otherwise."

    c.   On October 11, 2018, Adriane responded to Joshua Glazier by email, stating, "I cannot, however, release you from matters beyond [the AJJ Trust, GlazCo or Hutchinson] such as criminal or future intentional torts you include. The way your version is drafted, Jordy and I would be prohibited from talking to the police if we watched you murder someone in the future. . . The Agreement must be fair, reciprocal, [and] ethical . . . ."

    d.   On October 12, 2018, Joshua Glazier answered through counsel, who included Joshua Glazier on the response to Adriane, which said that in order to achieve an agreement, including the release of the AJJ Trust funds to Adriane, "'criminal or otherwise' must remain in [the Agreement], since while you don't have the ability to control governmental agencies, you cannot take any steps that would lead to criminal investigations. . . ."

All such acts were made in violation of 18 U.S.C. § 1512(b).

189. As a direct and proximate result of Joshua Glazier conducting and participating in the conduct of the association-in-fact enterprise's affairs through a pattern of racketeering activities in violation of 18 U.S.C. § 1962(c), and by reason thereof, Adriane has been injured in her property, specifically the value of her beneficial interest in the AJJ Trust and the Adriane Trust, and the loss of money and partnership interests in real property belonging to Adriane as a beneficiary of both trusts. Indeed, the aforementioned predicate acts directly resulted in injury to Adriane because they allowed Joshua Glazier to convert income and assets rightfully belonging to the AJJ Trust, eliminate or reduce the AJJ Trust's partnership interests, and conceal his retention of income and assets rightfully belonging to the AJJ Trust and obfuscate the amount due to Adriane.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in her favor, and against defendant Joshua Glazier, and: (1) pursuant to 18 U.S.C. § 1964(c), order Joshua Glazier to pay Adriane and/or the Adriane Trust, threefold the damages established by the evidence that Adriane and/or the Adriane Trust has sustained, presently alleged to be approximately $30 million; (2) pursuant to 18 U.S.C. § 1964(c), order Joshua Glazier to pay to Adriane the cost of this lawsuit, including reasonable attorney's fees; (3) pursuant to 18 U.S.C. § 1964(a), order Joshua Glazier to divest himself of any interest direct or indirect he holds in the AJJ Trust and in Glazier Corp.; (4) pursuant to 18 U.S.C. § 1964(a), prohibit Joshua Glazier from serving henceforth as Trustee of the AJJ Trust, or as trustee or executor of any other Glazier family trust or estate whose activities affect interstate commerce, including the REG Trust and the estates of Robert E. Glazier and Babette Glazier, and any further trusts created as part of their estate plans; and (5) grant such other and further relief as this Court deems just and proper.

### COUNT V
### Violation 18 U.S.C. Sec. 1962(a)
### (Against Defendant Joshua Glazier)

190.    Plaintiff states and incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 189 above.

191.    This Count is brought pursuant to 18 U.S.C. § 1964(c) for violation of 18 U.S.C. § 1962(a).

192.    Beginning in 1998 and continuing through the present, Joshua Glazier, as President and CEO of Glazier Corp. and Trustee of the AJJ Trust, has used and invested income that was derived from a pattern of racketeering activity, set forth in detail in Count IV, in an enterprise engaged in interstate commerce, namely Glazier Corp.

193.    The racketeering activity listed above in Paragraphs 168 to 188 constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

194.    Joshua Glazier invested the income he retained and converted by mail fraud, wire fraud, and engaging in a monetary transaction in property derived from specified unlawful activity, which rightfully belonged to the AJJ Trust, and invested that income into Glazier Corp.

195.    As a direct and proximate result of Joshua Glazier's investment of racketeering income and violations of 18 U.S.C. § 1962(a), and by reason thereof, Plaintiff has been injured in her property in that: (a) she lost money and property in which she held a beneficial interest as a beneficiary of the AJJ Trust and the Adriane Trust; (b) she lost the benefit of the investments that should have been made for the AJJ Trust; and (c) Joshua Glazier was able to conceal his conversion and retention of income and assets rightfully belonging to the AJJ Trust.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in her favor, and against defendant Joshua Glazier, and:  (1) pursuant to 18 U.S.C. § 1964(c), order Joshua Glazier to pay Adriane and/or the Adriane Trust, threefold the damages established by the evidence that Adriane and/or Adriane Trust has sustained, presently alleged to be approximately $30 million; (2) pursuant to 18 U.S.C. § 1964(c), order Joshua Glazier to pay to Adriane the cost of this lawsuit, including reasonable attorney's fees; (3) pursuant to 18 U.S.C. § 1964(a), order Joshua Glazier to divest himself of any interest direct or indirect he holds in the AJJ Trust or Glazier Corp.; (4) pursuant to 18 U.S.C. § 1964(a), prohibit Joshua Glazier from serving henceforth as Trustee of the AJJ Trust, or as trustee or executor of any other Glazier family trust or estate whose activities affect interstate commerce, including the REG Trust and the estates of Robert E. Glazier and Babette Glazier, and any further trusts created as part of their estate plans; and (5) grant such other and further relief as this Court deems just and proper.

### COUNT VI
### Unjust Enrichment
### (Against Defendant Abdo)

196.　Plaintiff states and incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 195 above.

197.　Abdo unjustly retained benefits to the detriment of Plaintiff, by engaging in the wrongful conduct described in Paragraphs 140-150.

198.　Abdo's retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in her favor, and against defendant Abdo in amount to be proven at trial but well in excess of $75,000, and award to Plaintiff: (1) disgorgement of all benefits conferred on Abdo and (2) such other and further relief as this Court deems just and proper.

### COUNT VII
### Unjust Enrichment
### (Against Defendant Glazier Corp.)

199.　Plaintiff states and incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 198 above.

200.　Glazier Corp. unjustly retained benefits to the detriment of Plaintiff, by engaging in the wrongful conduct described above.

201.　Glazier Corp.'s retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in her favor, and against defendant Glazier Corp. in amount to be proven at trial but well in excess of $75,000, and

award to Plaintiff: (1) disgorgement of all benefits conferred on Glazier Corp. and (2) such other

and further relief as this Court deems just and proper.

                                        **ADRIANE GLAZIER TUROW**


                                        By:     */s/ Adam A. Hachikian*
                                                   One of her Attorneys

Adam A. Hachikian (ARDC #6283021)
ahachikian@foxswibel.com
Ashley K. Martin  (ARDC #6297126)
amartin@foxswibel.com
**Fox Swibel Levin & Carroll LLP**
200 W. Madison St., Suite 3000
Chicago, IL 60606
(312) 224-1200

Dated: October 27, 2021