## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ADRIANE GLAZIER TUROW, individually )
and as beneficiary of the AJJ Investment Trust )
and Adriane S. Homer Descendant's Trust, )
                                             )
          Plaintiff, )
                                             )     No. 21 C 5756
     v. )
                                             )     Judge Sara L. Ellis
                                             )
JOSHUA M. GLAZIER, individually and as )
trustee of AJJ Investment Trust and the )
Adriane S. Homer Descendant's Trust, )
DANIEL J. ABDO, and GLAZIER )
COPORATION, )
                                             )
          Defendants. )

## OPINION AND ORDER

Plaintiff Adriane Glazier Turow brings this lawsuit individually and as beneficiary of the

AJJ Investment Trust (the "AJJ Trust") and the Adriane S. Homer Descendant's Trust (the

"Adriane Trust") against her brother, Joshua Glazier, individually and as Trustee of the AJJ Trust

and the Adriane Trust (collectively, the "Trusts"); Daniel Abdo, Joshua's business associate; and

Glazier Corporation, a real estate development company operated by Joshua as President and

CEO since 1998.  Adriane alleges that Joshua defrauded the Trusts of money and property with

Abdo's assistance.  Specifically, Adriane brings the following claims: breach of fiduciary duty

against Joshua (Count I); participation in Joshua's breach of fiduciary duty against Abdo (Count

II); common law fraud against Joshua (Count III); violations of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against Joshua (Counts IV and

V); and unjust enrichment against both Abdo (Count VI) and Glazier Corp. (Count VII).

Defendants now move to dismiss Adriane's complaint.  Because the complaint fails to allege that

Joshua engaged in a pattern of racketeering activity, the Court dismisses Adriane's RICO claims. However, Adriane has sufficiently alleged the remainder of her claims, and the complaint does not set forth everything necessary to demonstrate that the claims are untimely. So, the Court denies Defendants' motions with respect to the remainder of Adriane's claims.

## BACKGROUND[1]

### I.     The AJJ Trust

Adriane and Joshua's father, Bob Glazier, a real estate developer, founded Glazier Corp. In 1997, Bob established the AJJ Trust "to hold real estate and other assets [that] he intended to gift equally to three of his children:" Adriane, Joshua, and Jordan Glazier. Doc. No. 1 ¶ 2. To provide Adriane, Joshua, and Jordan with "continual financial support," Bob created multiple limited partnerships for real estate investments, naming Glazier Corp. as their general partner and the AJJ Trust as a limited partner. *Id.* ¶ 38. Specifically, the AJJ Trust held an interest in the following limited partnerships: (1) Hutchinson; (2) GlazCo; and (3) Blue Jay, Condor, Dove, Eagle, Sandpiper, and Sparrow (collectively, the "Birds"). Joshua's personal trust (the "JMG Trust") is also a limited partner in Hutchinson, GlazCo, and the Birds (collectively, the "HGB Partnerships"), while Abdo is a limited partner in only the Birds. When Bob died in 1998, Joshua became President and CEO of Glazier Corp., a position he holds today and through which he controls Glazier Corp.'s operations, finances, and business strategy. Abdo, a real estate professional, has worked for Glazier Corp. from about 1998 to the present.

The Bird partnership agreements provide that each partner will receive distributions equal to their "proportionate share from any property that [the] Bird[s] owned, including rental income

---

[1] The Court takes the facts in the background section from Adriane's complaint and the exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

and/or proceeds from the sale of the properties." *Id.* ¶ 37. These agreements also indicate that the AJJ Trust will be "a partner in all of Glazier Corp.'s future real estate developments." *Id.* ¶ 38. The Bird partnership agreements further provide that Glazier Corp., the JMG Trust, Abdo, and the AJJ Trust "would use the Birds as the vehicle to 'pursue all real estate projects of the Partners and their respective affiliates' so long as Abdo devoted his full business attention to projects Glazier Corp. pursued." *Id.* ¶ 39. The agreements also state that Glazier Corp. "'will not be entitled to any administrative or management fees with respect to the operation of Partnership properties,' unless Abdo ceased to provide full time services to Partnership projects." *Id.* ¶ 42(b).

The AJJ Trust Agreement dictates that the trust estate would "be retained in three separate trusts, one for each child" ("the Descendant's Trusts") and named Joshua and Jonathan Mills as Co-Trustees of both the AJJ Trust and each of the Descendant's Trusts. *Id.* ¶ 25. As Trustee, Joshua owes fiduciary duties to the Trusts and their beneficiaries including a duty "to abide by the terms of the trust agreements, act with fidelity and good faith, serve the beneficiaries' interests with complete loyalty, and refrain from dealing with the trust property for his individual benefit." *Id.* ¶ 133. Despite their designation as Co-Trustees, Joshua "did not consult with Mills on the vast majority of decisions relating to the AJJ Trust." *Id.* ¶ 28. When Mills resigned from his position as Co-Trustee in or around 2004, Joshua did not inform Adriane, and the successor designated in the Agreement (Martin Weinstein) did not take Mills' place. Instead, Joshua designated his mother, Babette Glazier, as Co-Trustee. Babette does not have any business experience, relies on Joshua in all financial matters, and takes no active role in managing the AJJ Trust. As a result, Joshua "has acted as the *de facto* sole Trustee of the AJJ Trust and Descendant's Trusts at all times since Bob's death." *Id.* ¶ 34. Abdo knew that Joshua

"served as Trustee of the AJJ Trust, and as such owed fiduciary duties to the AJJ Trust and its

beneficiaries, including the duty to act in the AJJ Trust's best interest and to avoid self-dealing."

*Id.* ¶ 140.

## II.    Fraudulent Operation of the AJJ Trust

From 1998 through the present, the AJJ Trust and Glazier Corp. "operated in concert for

the unlawful purpose of intentionally defrauding Adriane, as a beneficiary of the AJJ Trust and

the Adriane Trust, of money and property" through multiple interrelated fraudulent schemes.  *Id.*

¶ 161.  In doing so, Joshua "committed multiple acts indictable as wire and mail fraud,

transporting stolen goods in interstate commerce, conducting financial transactions in property

derived from specified unlawful activity, and witness tampering."  *Id.* ¶ 164.

### A.    Commingling and Converting the AJJ Trust's Funds

As Trustee, Joshua "was responsible for all financial aspects of the AJJ Trust and the

Descendant's Trusts."  *Id.* ¶ 35.  Joshua failed to "open[] individual accounts for any of the

Descendant's Trusts."  *Id.* ¶ 74.  And although he opened a bank account for the AJJ Trust (the

"AJJ Account") in 2001, he only deposited portions of the AJJ Trust's share of the proceeds

from the HGB Partnerships within the account.  Then, in 2009, Joshua stopped using the AJJ

Account and began "depositing all of the AJJ Trust's income and earnings directly into Glazier

Corp.'s accounts."  *Id.* ¶ 75.  As President and CEO of Glazier Corp., the general partner of the

HGB Partnerships, Joshua controlled the partnerships' distributions and diverted nearly all of the

AJJ Trust's share of income from the HGB Partnerships to himself, Glazier Corp. or Abdo.

From 1998 through 2018, the HGB Partnerships produced more than $30 million in revenue but

the Adriane Trust only received approximately $560,000.  Aside from this amount, "none of the

annual rental or investment income [from the HGB Partnerships] has been paid to Adriane or the Adriane Trust." *Id.* ¶ 71.

### B. Eliminating the AJJ Trust's Partnership Interests in the Birds

Soon after Bob died, Joshua attempted to "eliminate or drastically reduce the AJJ Trust's partnership interests in the Birds" and reallocate those interests to himself, Glazier Corp. or Abdo. *Id.* ¶ 78. For three of the Birds, Joshua did so by purporting to amend or restate the partnership agreements. Abdo signed one of these restated agreements. However, the Bird partnership agreements "expressly require the AJJ Trust to remain a partner through at least 2030." *Id.* ¶ 84. Moreover, Joshua did not file the purportedly restated partnership agreements with the Illinois Secretary of State. Therefore, these changes "were legally ineffective," *id.* ¶ 79, and the AJJ Trust "continues to own partnership interests in each of the Birds," *id.* ¶ 93.

For the remaining three Birds, Joshua excluded the AJJ Trust from property sale proceeds "by reporting the AJJ Trust's interest in those partnerships as '0.00%' on their tax returns" whenever the partnership sold a property. *Id.* ¶ 95. For example, when Joshua sold a property owned by Condor on December 11, 2011, he reduced the AJJ Trust's interest by 49% and increased the JMG Trust's interest by 49% on Condor's 2011 tax return. On November 11, 2006, Joshua withdrew $129,000 from the AJJ Account, sent it via wire transfer to himself, and purchased a property for Eagle. At the time, the AJJ Trust was at least a 45% partner in Eagle but Joshua reported on Eagles' 2006 tax return that the AJJ Trust had a 0% interest, while increasing Abdo's interests by 20% and Joshua's by 30%.

Joshua distributed the Birds' earnings according to these false interests, thereby depriving the AJJ Trust of the earnings that the partnership agreements entitled it to and unlawfully increasing the earnings of himself and Abdo. By 2011, Joshua "had wrongfully 'eliminated' the

AJJ Trust's interest in every Bird. No consideration was conveyed to the AJJ Trust in exchange for purportedly relinquishing its interests in any of the Birds." *Id.* ¶ 81. Abdo was aware of Joshua's actions and "affirmatively assisted and helped conceal" them by failing to inform Adriane. *Id.* ¶ 147.

### C. False Tax Returns

As Trustee, Joshua filed the Trusts' tax returns using either U.S. mail or interstate wires. Joshua falsely reported on various HGB Partnership and AJJ Trust tax returns that the HGB Partnerships made distributions to the AJJ Trust even though Joshua knew that the AJJ Trust did not receive those distributions. Instead, as described above, Joshua distributed all or most of the AJJ Trust's share of income to himself, Glazier Corp., or Abdo. For example, Joshua falsely stated on Hutchinson's 1999 tax return, which he filed through U.S. mail, that the AJJ Trust received $416,555 in distributions from Hutchinson, when he knew he had distributed those funds to Glazier Corp. Joshua also falsely reported that the AJJ Trust distributed income to the Adriane Trust or Adriane personally on many tax returns, causing Adriane to personally pay taxes for income she did not receive.

### D. Excessive Management Fees

From 1998 through 2017, Joshua paid management fees to himself, Glazier Corp., and/or other affiliates of his that "grossly exceeded market rates," totaling more than $3 million. *Id.* ¶ 113. For example, Joshua paid himself approximately $2,500 per month in management fees for a property owned by Hutchinson even though the market rate for such a property was $1,000 per month. Knowing that the partnership agreements prohibited these fees, Joshua failed to disclose them to Adriane for years. On May 15, 2017, Joshua admitted that he had paid himself

management fees in 2015 and 2016 for the properties held by Hutchinson and GlazCo but lied about the amount of the fees.

### E.     Concealment Through Misrepresentations

Starting in 2008, Joshua repeatedly made material misrepresentations to Adriane regarding the AJJ Trust so that he could "continue to retain the income and assets of the AJJ Trust for himself and/or Glazier Corp." *Id.* ¶ 124.  Joshua made many of these misrepresentations through emails that "constituted interstate wire communications." *Id.* ¶ 162. Adriane relied on Joshua's statements because of his position as Trustee of the Trusts and "his business acumen." *Id.* ¶ 153.  Joshua frequently copied Jordan on these messages "in an attempt to lend credence" to them because Adriane knew of "Jordan's business success and financial acumen." *Id.* ¶ 126.  On multiple occasions, when Adriane asked Joshua whether she could receive funds from the AJJ Trust, he said that the AJJ Trust did not have any income and could not provide her with any support.  Further, on March 26, 2009, Joshua emailed Adriane stating that "he was 'terminating some sub-trusts to the AJJ Trust' because they were expensive to keep and there was not 'much need to continue their existence.'" *Id.* ¶ 152(b).  However, Joshua knew he had no authority to terminate the Descendant's Trusts because the AJJ Trust Agreement unequivocally established them.

In 2014 and 2015, Joshua purported to summarize the AJJ Trust's history and holdings for the first time.  In these summaries, he omitted any reference to the Birds, under-reported the income earned by the HGB Partnerships, omitted or vastly understated the management fees he paid himself, and "falsely claimed that the AJJ Trust was indebted to him." *Id.* ¶ 128.  Joshua also claimed that he had made "gifts" to the AJJ Trust, which were actually distributions from the Birds owed to the AJJ Trust. *Id.* ¶ 129.  In August 2015, Adriane and her husband met with

Jordan and Joshua at Adriane's home. Joshua stated that "the story ha[d] changed" regarding the AJJ Trust and blamed it on "faulty recollections." *Id.* ¶ 130. "Nonetheless, [Joshua] was far from transparent about the AJJ Trust's holdings and finances" and "[a]t the conclusion of the meeting, Jordan promised on behalf of himself and Joshua [] that a full and complete reconciliation and accounting of the AJJ Trust's finances since its inception would be completed as soon as the two remaining properties held by the HGB Partnerships were sold." *Id.* At present, Joshua has never provided Adriane with an accurate accounting of the AJJ Trust.

## III.    Discovery of the Fraud

Joshua's fraudulent schemes prevented Adriane from discovering his misconduct and her own injuries for many years. "In August 2017, Joshua [] was preparing to sell the last property in which the AJJ Trust held an interest and, accordingly, wind up the AJJ Trust and distribute the remaining cash to its beneficiaries." *Id.* ¶ 50. To fulfill his promise to Adriane, Jordan hired an accountant named Michael Eggert to review the AJJ Trust's finances. In August 2018, Eggert completed a report detailing the distributions that each AJJ Trust beneficiary was entitled to (the "Eggert Report"). To complete the report, Eggert relied "almost exclusively upon documents provided to [him] by Joshua." *Id.* ¶ 52. As a result, the Eggert Report "grossly understated the assets of the AJJ Trust" and the beneficiaries' respective shares. *Id.*

Thereafter, Joshua "pressed Adriane to enter into a settlement agreement" in exchange for distributing her purported share of the AJJ Trust. *Id.* ¶ 54. On October 10, 2018, Joshua emailed Adriane a draft agreement that included "language providing that Adriane would waive all remedies for any undisclosed fraud he may have committed as Trustee." *Id.* ¶¶ 54, 188(b). Adriane suggested changes to this language and on October 12, Joshua's counsel responded, copying Joshua on the email, and stating that the language must remain in the agreement because

8

although she does not "have the ability to control governmental agencies, [she] cannot take any steps that would lead to criminal investigations." *Id.* ¶ 188(d). On April 11, 2019, Joshua admitted that he had failed to disclose to Eggert or Adriane the existence of a property that GlazCo had previously owned. Despite this, Jordan signed a settlement agreement with Joshua, releasing any claims against Joshua in exchange for a final distribution of his share of the AJJ Trust. However, Adriane refused to sign the agreement and instead began investigating the real estate holdings of Glazier Corp., GlazCo, and Hutchinson. Adriane's investigation revealed that Joshua had concealed many other properties from her and Eggert. She confronted Joshua with this information on November 19, 2019.

In response, on February 26, 2020, Joshua produced hundreds of new documents that revealed for the first time the existence of the Birds and other partnerships that Joshua formed after Bob's death (the "Excluded Birds") "into which he transferred certain real estate owned by the Birds and acquired other properties." *Id.* ¶ 45. Contrary to the provisions of the Bird partnership agreements, Joshua did not include the AJJ Trust as a partner in the Excluded Birds. These newly disclosed documents showed that Joshua had "defrauded Adriane and converted millions of dollars that rightfully belonged to the AJJ Trust and its beneficiaries." *Id.* ¶ 65. Also on February 26, Joshua "disavowed the Eggert Report, expressly stating that it was based on inaccurate information" and that it excluded the Birds. *Id.* ¶ 61. Joshua then hired a different accountant, Jim Donenberg, who prepared a new report of the AJJ Trust's assets (the "Donenberg Report") which included the Birds but still undervalued the assets and "fabricat[ed] fees and charges." *Id.* ¶ 64. Adriane filed this lawsuit approximately eight months later, on October 27, 2021.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case."  *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted).  Rule 9(b) does not govern only claims of fraud; it applies to all allegations and averments of fraud.  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).  "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements."  *Borsellino*, 477 F.3d at 507.

## ANALYSIS

### I.     Timeliness of Claims

Defendants move to dismiss Adriane's breach of fiduciary duty, fraud, and RICO claims as untimely.  The Court can dismiss time-barred claims under Rule 12(b)(6) where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense."  *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005); *see also Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (considering statute of limitations defense on motion to dismiss where relevant dates were set forth in the complaint).

#### A.     RICO Claims

The parties agree that Adriane's RICO claims are subject to a four-year statute of limitations, *Rotella v. Wood*, 528 U.S. 549, 553 (2000), but they disagree as to whether the complaint reveals that these claims accrued before October 27, 2017 (four years before Adriane filed this suit).  A "RICO claim accrues when the plaintiffs knew or should have known of their injury."  *Maron v. Am. Enter. Bank*, No. 21-2773, 2022 WL 807379, at *2 (7th Cir. Mar. 16, 2022).  Thus, it is "discovery of the injury, not discovery of the other elements of a claim, [that] starts the clock."  *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 926 (7th Cir. 2015) (citation omitted).

Here, the complaint alleges that Joshua's pattern of racketeering activity defrauded Adriane, as a beneficiary of the Trusts, of money and property.  Joshua contends that the complaint reveals Adriane knew of her injury as early as the 2009 tax filing season because it alleges that Joshua sent her "K-1s reflecting distributions to her personally in 2009, 2010, 2011, 2012, and 2013" and she necessarily knew at the time that she did not receive those distributions.  Doc. 1 ¶ 111.  Thus, Joshua argues that Adriane knew of her alleged personal tax liability

injuries well before October 2017. *See id.* (alleging Joshua "caused Adriane to personally pay income taxes on money he had retained for his or Glazier Corp.'s use"). However, the RICO claims do not allege injury to Adriane in her personal capacity and do not include her personal tax liability as an alleged predicate act; instead, they allege injury to her beneficial interest in the Trusts and predicate acts relating to those injuries. *See id.* ¶ 161 (alleging the RICO enterprise's purpose was "defrauding Adriane, as a beneficiary of [the Trusts], of money and property"); *id.* ¶ 189 (alleging that the RICO enterprise's conduct harmed the value of Adriane's beneficial interest in the Trusts and caused "the loss of money and partnership interests in real property belonging to Adriane as a beneficiary"). Thus, even if the complaint revealed Adriane's knowledge of her personal tax liability, that does not start the clock for her RICO claims. *Cf. Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386–87 (7th Cir. 2010) ("[T]he injury arising from the first predicate act to injure the plaintiff ('predicate acts' are the illegal acts committed by the racketeering enterprise) starts the limitations period running.").

Joshua further argues that Adriane should have known of her alleged injuries after she received the false K-1s. He contends that the false K-1s put Adriane "on notice that something was amiss," Doc. 18 at 31–32, and that together with Josh's 2015 statement that "the story ha[d] changed" regarding the AJJ Trust, Doc. 1 ¶ 130, the K-1s would have caused "a reasonably diligent person to investigate," Doc. 18 at 32. *Cf. Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (noting that whether RICO plaintiffs should have known of their injury "depends on whether [and when] they had sufficient information of possible wrongdoing to place them on 'inquiry notice'" (alteration in original) (citation omitted)). However, the complaint alleges that Adriane could not have "reasonably discovered" her RICO injury until February 2020 when Joshua provided her with previously concealed documents. Doc. 1 ¶ 166. The

complaint further alleges that Joshua "did not provide Adriane with regular records, and never provided an accurate accounting of the AJJ Trust." *Id.* ¶ 35. Thus, at this stage, accepting the allegations of the complaint as true, the Court cannot conclude that Adriane's RICO claims are "indisputably time-barred." *Burns v. United States*, 762 F. App'x 338, 339 (7th Cir. 2019) (citation omitted); *see Fund Recovery Servs., LLC v. RBC Cap. Mkts., LLC*, No. 20 C 5730, 2022 WL 142404, at *3 (N.D. Ill. Jan. 17, 2022) (denying motion to dismiss RICO claim as untimely because the "statute of limitations inquiry is too fact-bound" and the Court was "obligated to take the well-pleaded factual allegations in the amended complaint as true, including [plaintiff's] allegation that it first learned of the defendants' fraudulent conduct in December 2016").

Moreover, the complaint does not contain details regarding the K-1s that would be helpful in assessing when a reasonable person should have discovered Adriane's injury—such as what information the K-1s included and how Joshua explained/described them to her. "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman*, 782 F.3d at 928. Therefore, the Court lacks sufficient information to make such a factual determination at this time. *See id.* at 928–29 (finding district court erred by dismissing RICO claims "without giving the parties an opportunity for discovery into when a reasonable benefit fund should have known about its injuries"); *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 683 (N.D. Ill. 2012) (denying motion to dismiss RICO claims as untimely where based on allegations in the complaint, plaintiff "neither knew nor could have known of the alleged injury" prior to when it filed the complaint). "Dismissing a complaint as untimely at the pleading stage is an unusual step,"

13

*Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009), and the Court declines to do so here where questions remain regarding Adriane's discovery of her RICO injuries. The Court denies Joshua's motion to dismiss Adriane's RICO claims as untimely.

### B. Breach of Fiduciary Duty and Fraud Claims

#### 1. Five Year Statute of Limitations

Similarly, the parties agree that Adriane's breach of fiduciary duty, participation in a breach of fiduciary duty, and fraud claims are subject to a five-year statute of limitations. *See* 735 Ill. Comp. Stat. 5/13-205 (setting statute of limitations "to recover damages for an injury done to property, real or personal" as five years); *Carter v. Gomberg*, No. 19 C 02598, 2020 WL 1468592, at *4 (N.D. Ill. Mar. 25, 2020) (noting that statute of limitations for breaches of fiduciary duty and common law fraud claims in Illinois is five years). However, the parties disagree as to whether the complaint reveals that these claims accrued before October 27, 2016 (five years before Adriane filed this suit). The discovery rule applies to breach of fiduciary duty and fraud claims, which dictates that the claims accrue when the plaintiff: "(1) knows or reasonably should know of his injury and (2) knows or reasonably should know that it was wrongfully caused." *Paulsen v. Abbott Lab'ys*, 39 F.4th 473, 477 (7th Cir. 2022) (quoting *Doe v. Hastert*, 2019 IL App (2d) 180250, ¶ 30). This inquiry depends on whether the plaintiff has "sufficient information concerning [the] injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved," *Tuduj v. Sanofi-Aventis U.S. LLC*, 721 F. App'x 496, 499 (7th Cir. 2018), and is "generally a question of fact," *Doe*, 2019 IL App (2d) 180250, ¶ 30.

As with the RICO claims, Defendants argue that the complaint reveals Adriane knew of her alleged personal tax liability as early as the 2009 tax filing season because it alleges that

Joshua sent her K-1s reflecting income she did not receive starting in 2009.  Unlike her RICO

claims, Adriane's breach of fiduciary duty and fraud claims seek redress for the personal tax

liability that Joshua caused her to incur.  *See* Doc. 1 ¶¶ 134(i), 135, 154.  But based on the

allegations in the complaint, it is unclear whether Adriane reasonably should have known that

Joshua *wrongfully caused* her personal tax liability.  Even if one could reasonably infer from the

complaint that Adriane knew before 2016 that she paid taxes on income she did not receive, it is

unclear whether this constituted "sufficient information concerning [the] injury and its cause to

put a reasonable person" on notice of her claims.  *Tuduj*, 721 F. App'x at 499 (alteration in

original).  The complaint alleges that in March 2009, Joshua told Adriane that the AJJ Trust

beneficiaries would "save some money" by personally paying their own taxes.  Doc. 1 ¶ 176.  It

further alleges that Adriane did not receive the income reflected in the K-1s because Joshua

"retained [it] for his or Glazier Corp.'s use," *id.* ¶ 111, and that she did not discover that Joshua

had defrauded her of this income until February 2020 when he produced previously concealed

documents, *id.* ¶¶ 59, 65.  Thus, the complaint does not unambiguously establish that Adriane

knew Joshua wrongfully caused her personal tax liability.  *See Hyson USA, Inc. v. Hyson 2U,

Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016) (noting that "dismissal is appropriate *only* when the

factual allegations in the complaint unambiguously establish all the elements of the defense").

And again, although it may be true that the K-1s should have led a reasonable person to

investigate, the complaint does not foreclose the possibility that Adriane acted reasonably based

on the information available to her at the time.  *See In re Sandburg Mall Realty Mgmt. LLC*, 563

B.R. 875, 890 (C.D. Ill. 2017) (denying motion to dismiss breach of fiduciary duty and fraud

claims as untimely because "questions of fact are involved, including the exact date that

[plaintiff] first became aware of, or should have become aware of" the alleged injury).

Similarly, Defendants contend that the complaint reveals Adriane knew of her claimed injury relating to the elimination of the Descendant's Trusts because the complaint alleges that Joshua told her he was terminating the "sub-trusts" in a March 2009 email.  Doc. 1 ¶ 152(b).  Adriane's breach of fiduciary duty and fraud claims seek redress for this termination.  *Id.* ¶¶ 134(m), 152(b).  Specifically, the complaint alleges that Joshua told Adriane in 2009 that he was "terminating some sub-trusts to the AJJ trust that cost several hundred $$ each year to keep without much need to continue their existence."  *Id.* ¶ 176.  Based on Joshua's contemporaneous explanation for terminating the Descendant's Trusts, it is unclear whether Adriane knew at the time that he wrongfully caused the termination or that the termination injured her.  So, the complaint does not reveal that Adriane knew Joshua wrongfully caused the termination in 2009. *See Mirror Finish PDR, LLC v. Cosm. Car Co. Holdings, Inc.*, No. 20-CV-00440, 2021 WL 5038823, at *5 (S.D. Ill. Oct. 29, 2021) (denying motion to dismiss fraud and breach of fiduciary duty claims as untimely where complaint pleaded that plaintiff "could not have reasonably known about its injury" until five years before it filed suit).  And whether a reasonable person would have known of this injury based on the information available to Adriane at the time is a factual question that the Court cannot resolve at this stage.  *See Elward v. Electrolux Home Prods., Inc.*, 264 F. Supp. 3d 877, 889 (N.D. Ill. 2017) (denying motion to dismiss where "the parties dispute[d] when [plaintiff] discovered the cause of action" and such a "factual dispute cannot be resolved based on the pleadings").

### 2.      Three Year Statute of Limitations

Abdo also argues that the Illinois Trust Code ("ITC")'s statute of limitations for actions against a trustee bars Adriane's claims against him because she brought them more than three years after receiving the Eggert Report.  The ITC provides that "[a] beneficiary may not

commence a proceeding against a trustee for breach of trust for any matter disclosed in writing by a trust accounting . . . unless an action against the trustee is instituted by the beneficiary . . . within 3 years after the date the current account is furnished."  760 Ill. Comp. Stat. 3/1005(a)(2). The ITC defines a "trust accounting" as communications that "describe: (A) the trust property, liabilities, receipts, and disbursements, including the amount of the trustee's compensation; (B) the value of the trust assets on hand at the close of the accounting period, to the extent feasible; and (C) all other material facts related to the trustee's administration of the trust."  760 Ill. Comp. St. 3/103(38).  The complaint alleges that Adriane received the Eggert Report in August 2018, Doc. 1 ¶¶ 52–53, so Abdo argues that the ITC required Adriane to bring any claim against him related to Joshua's breach of fiduciary duty by August 2021.  In response, Adriane asserts that Section 1005(a) only pertains to actions against trustees and therefore does not apply to her claims against Abdo, who is not a trustee.  Abdo does not respond to this argument and fails to provide the Court with any legal support for such an application.  *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) (noting that "[f]ailure to respond to an argument generally results in waiver").

Moreover, as Adriane points out, the complaint alleges that "Joshua [] disavowed the Eggert Report" in 2020, Doc. 1 ¶ 61, and that he "never provided [Adriane with] an accurate accounting of the AJJ Trust," *id.* ¶ 35.  Thus, the complaint does not conclusively establish that the ITC required Adriane to bring these claims prior to October 2021.  *See Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014) (asserting "the complaint must 'plainly reveal [ ] that [the] action is untimely under the governing statute of limitations" (alterations in original) (citation omitted)).  In conclusion, the Court cannot find based on the complaint that Defendants' timing defenses bar Adriane's breach of fiduciary duty

17

and fraud claims and as a result, it denies Defendants' motions to dismiss Adriane's claims as untimely.

## II.     Failure to State a Claim

Defendants next argue that the Court should dismiss the complaint because it fails to sufficiently allege each claim.

### A.     RICO Claims

RICO "provides a civil cause of action for private plaintiffs" who have been "injured 'by reason of' a defendant's RICO violation." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 456 (2006) (citation omitted); *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019). Adriane brings two RICO claims against Joshua for violations of Sections 1962(a) and 1962(c). To state a claim for a violation of § 1962(c), Adriane must sufficiently plead conduct of an enterprise through a pattern of racketeering activity. *Menzies*, 943 F.3d at 336. To state a claim for a violation of § 1962(a), Adriane must sufficiently plead "that a defendant received income from a pattern of racketeering activity" and "used or invested that income in the operation of an enterprise." *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 699 (7th Cir. 2021). Additionally, to recover under either section, Adriane must allege that her injuries arise "by reason of" the § 1962 violation, requiring both "but for" and proximate causation. 18 U.S.C. § 1964(c); *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). Joshua argues that Adriane fails to adequately allege that he engaged in a pattern of racketeering activity, that the alleged conduct caused her injuries, or that he received and invested income from a pattern of racketeering activity. Because the issue is dispositive, the Court need only address whether Adriane has sufficiently pleaded that Joshua engaged in a pattern of racketeering activity.

18

### 1. Pattern of Racketeering Activity

Sections 1962(a) and 1962(c) both require a plaintiff to sufficiently plead a pattern of racketeering activity. 18 U.S.C. § 1962(a), (c); *see Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1048 (7th Cir. 1998) (noting "a pattern [of racketeering activity] is an essential element of a claim under both sections 1962(a) and 1962(c)"). "A pattern requires the commission of at least two predicate acts of racketeering activity occurring within ten years of each other." *DeGuelle*, 664 F.3d at 199.

### a. Racketeering Activity

Predicate acts of "racketeering activity" include the commission of various enumerated crimes. 18 U.S.C. § 1961(a). Here, the complaint alleges twenty-one predicate acts "indictable as wire and mail fraud, transporting stolen goods in interstate commerce, conducting financial transactions in property derived from specified unlawful activity, and witness tampering" occurring over a period of eighteen years. Doc. 1 ¶ 164. A vast majority (eighteen) of the predicate acts allege that Joshua committed mail or wire fraud. When "a plaintiff seeks to plead RICO's pattern element through predicate acts of mail or wire fraud . . . the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply and require a plaintiff to do more than allege fraud generally." *Menzies*, 943 F.3d at 338. Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Given these heightened pleading standards and Congress's insistence that a RICO claim entail a clear pattern of racketeering activity, [the Seventh Circuit has] cautioned that '[it] do[es] not look favorably on many instances of mail and wire fraud to form a pattern.'" *Menzies*, 943 F.3d at 338 (citation omitted). Mail and wire fraud each require: (1) "the defendant's participation in a scheme to defraud;" (2) the defendant's use of either mail or interstate wires, respectively, "in furtherance of the

19

scheme;" and (3) the "defendant's commission of the act with intent to defraud." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 657 (7th Cir. 2015) (citation omitted). Here, Adriane alleges that Joshua participated in a scheme to defraud the Trusts and their beneficiaries of money and property, but Joshua argues that Adriane fails to sufficiently allege that he used the mail or interstate wires in furtherance of this scheme.

First, the complaint alleges that Joshua committed mail and wire fraud by filing false tax returns on six occasions. However, based on the allegations in the complaint, Joshua filed these tax returns to deceive the Internal Revenue Service, not to defraud the Trusts. *See* Doc. 1 ¶ 96 (alleging Joshua filed false tax returns in part "so the IRS would not question why the AJJ Trust – a longtime partner in that entity – had not reported income from the sale"); *id.* ¶ 102 (alleging Joshua filed false tax returns to "allow[] him to falsely lower the taxes due"). "[O]ne cannot commit mail or wire fraud by fooling one person to receive something of value from another." *Calavan v. First Love Int'l Ministries*, No. 21 C 185, 2022 WL 704810, at *5 (N.D. Ill. Mar. 9, 2022) (alteration in original) (citation omitted). Thus, the complaint fails to allege that Joshua filed the false tax returns in furtherance of the scheme to defraud. *See Calavan*, 2022 WL 704810, at *5 (finding that an email which intended to deceive a third party, not the plaintiff, did not sufficiently allege mail or wire fraud as a predicate act); *Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839, 848 (N.D. Ill. 2013) (finding that a foreclosure filing which intended to deceive the court, not the plaintiff, did not sufficiently allege mail or wire fraud as a predicate act).

Second, the complaint alleges that Joshua committed twelve acts of wire fraud by making various false statements regarding the Trusts' money and property by email or phone to Adriane. Joshua argues that these statements merely concealed the scheme to defraud and therefore were

20

not made in furtherance of the scheme. In response, Adriane contends that these statements were made in furtherance of the scheme because they concealed the scheme and thus, allowed it to continue. *See United States v. Hernandez*, 952 F.3d 856, 860 (7th Cir. 2020) ("[M]ailings occurring after the fraudulent act are within the mail fraud statute if they assisted the defendant with avoiding detection."). Here, the complaint alleges that Joshua's false statements regarding the Trusts "prevented Adriane from discovering that [he] had committed multiple indictable acts." Doc. 1 ¶ 166. Thus, at this stage, Adriane has sufficiently pleaded that Joshua committed various acts of wire fraud. *See United States v. Ashman*, 979 F.2d 469, 484 (7th Cir. 1992) (finding that interstate wires "furthered the scheme by depicting normalcy to, and forestalling complaints or inquiries by" those injured).

Next, predicate act number four alleges that Joshua withdrew $129,000 from the AJJ Account and then purchased a property for Eagle on November 11, 2006 in violation of 18 U.S.C. § 1957. Section 1957 makes it unlawful to "knowingly engage[] . . . in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). Joshua argues that the complaint does not plausibly allege that Joshua wrongfully withdrew this money (making it criminally derived) given that, as Trustee, he had "unfettered discretion to invest or distribute AJJ Trust funds to beneficiaries," of which he is one. Doc. 18 at 29. In other words, Joshua contends that he could have withdrawn the funds for a legitimate purpose. However, at this stage, the Court must "construe the complaint in the light most favorable to plaintiff." *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). It is reasonable to infer from the complaint that Joshua stole, converted, or took this money by fraud. *See* Doc. 1 ¶ 171 (alleging Joshua transferred the money to himself and then excluded the AJJ Trust from a property investment

21

purchased on the same day); *id.* ¶ 69 (alleging that Joshua regularly converted "earnings due to the AJJ Trust and the Adriane Trust to Glazier Corp., himself, and/or his business partner, Abdo"). Thus, Adriane has sufficiently alleged Joshua violated Section 1957.[2] *See United States v. McClellan*, 794 F.3d 743, 753 (7th Cir. 2015) (finding evidence sufficient to support 18 U.S.C. § 1957 conviction where it showed defendant purchased a home using fraudulently obtained funds).

Relatedly, predicate act number five alleges that Joshua transmitted the $129,000 via wire transfer to himself on or about November 11, 2006 in violation of 18 U.S.C. § 2314. Section 2314 proscribes transferring money in interstate commerce that was stolen, converted, or taken by fraud. 18 U.S.C. § 2314. Joshua argues that the complaint "fails to plead any fact in support of the boilerplate allegation that anything was transported 'in interstate commerce.'" Doc. 18 at 29. However, the complaint alleges that Joshua sent the $129,000 in interstate commerce via wire transfer, which suffices at this time. *See James Streibich Revocable Trust of 2002 v. Flagstad*, No. 20 CV 2242, 2021 WL 1546439, at *8 (N.D. Ill. Apr. 20, 2021) (finding complaint sufficiently pleaded 18 U.S.C. § 2314 violation as predicate offense by alleging defendant transferred funds via wire transfer). Thus, the complaint sufficiently alleges that Joshua transported stolen property in interstate commerce.

---

[2] Joshua also contends that the complaint's characterization of his actions as embezzlement is irrelevant because Section 1957 does not include embezzlement as a "specified unlawful activity" from which the funds must be derived. *See* 18 U.S.C. § 1957(f)(3) (defining "specified unlawful activity" as having the same meaning as the term in Section 1956); 18 U.S.C. § 1956(7)(A) (defining "specified unlawful activity" as "any act or activity constituting an offense listed in section 1961(1)"); *Hudgens v. Pratha Ent., Inc.*, No. 16-CV-10684, 2017 WL 977009, at *5 (N.D. Ill. Mar. 14, 2017) ("[T]he only embezzlement crimes listed in § 1961(1) are 'embezzlement from union funds' and 'embezzlement from pension funds.'" (citing 18 U.S.C. § 1961(1))). While this is true, Section 1957 includes transporting stolen or converted property in interstate commerce as a "specific unlawful activity" from which funds must be derived, which, as explained below, Adriane sufficiently alleges. 18 U.S.C. § 1961(1) (including violations of Section 2341).

Finally, predicate act number twenty-one alleges that Joshua engaged in witness tampering in violation of 18 U.S.C. § 1512(b)(3) in 2018 by corruptly attempting to persuade Adriane to sign a settlement agreement that would have barred her from communicating information relating to commission of a federal offense to law enforcement. Joshua asserts that Adriane fails to sufficiently allege witness tampering because the complaint does not allege that anyone threatened or coerced her to sign the settlement agreement, but Section 1512 proscribes "corruptly persuad[ing]" or attempting to corruptly persuade another person as well. 18 U.S.C. § 1512(b)(3). Joshua also argues that because Joshua's attorney made the alleged statement, not Joshua, it cannot constitute a predicate act. However, Joshua fails to cite any support for this argument. Given that the complaint alleges that Joshua made the statement through his lawyer, Doc. 1 ¶ 188(d), and that in general, a lawyer speaks for her client, *Jackson v. Lawrence*, No. 20-1081, 2020 WL 5550385, at *4 (C.D. Ill. Sept. 16, 2020), the Court fails to find Joshua's argument persuasive.

To summarize, Adriane has sufficiently alleged fifteen predicate acts of racketeering activity—twelve acts of wire fraud, one act of conducting a financial transaction in property derived from specified unlawful activity, one act of transporting stolen goods in interstate commerce, and one act of witness tampering—occurring within ten years of each other (from 2006 to 2018). But the "pattern" requirement "was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Lipin Enters. Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986). So, Adriane must also satisfy the "continuity plus relationship" test: she must identify predicate acts of racketeering activity that are "related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Jennings v. Auto Meter Prods.*,

*Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (citation omitted); *see also Menzies*, 943 F.3d at 337. Joshua primarily argues that the alleged predicate acts do not pose a threat of continued criminal activity. To satisfy the continuity prong, a plaintiff must plead either an "open-ended" or a "closed-ended" series of criminal conduct. *Id.*

### b. Continuity Based on Open-Ended Conduct

An open-ended series of misconduct is not "inherently terminable"; it "threatens repetition and thus future harm" by "its intrinsic (e.g., business-as-usual) nature." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 829 (7th Cir. 2016); *Gamboa v. Velez*, 457 F.3d 703, 706 (7th Cir. 2006). The open-ended continuity inquiry "focuses not on what acts occurred in the past but on whether a concrete threat remains for the conduct to continue moving forward." *Menzies*, 943 F.3d at 337. A plaintiff can demonstrate this threat in one of three ways: "by showing that a defendant's actions pose a specific threat of repetition; that the predicate acts form part of the defendant's ongoing and regular way of doing business; or that the defendant operates a long-term association for criminal purposes." *Id.* Here, Adriane contends that Joshua's fraudulent actions pose a specific threat of repetition. However, the complaint fails to allege such a threat.

Schemes that "have a clear and terminable goal have a natural ending point" and thus do not pose a threat of repetition. *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 782–83 (7th Cir. 1994); *see Empress Casino*, 831 F.3d at 829 ("We have repeatedly held that schemes fail to satisfy open-ended continuity where they have a 'natural ending point.'"). Yet a fraudulent scheme with a "clear and terminable goal" and a "natural ending point" is precisely what Adriane has alleged here. The scheme's alleged goal is to convert money and property from the Trusts. Once Joshua accomplishes this goal, the alleged scheme is complete, and no

24

more fraudulent conduct is necessary. In other words, Joshua's alleged fraudulent scheme naturally ends when the AJJ Trust ends. There is therefore no threat of repeated criminal activity that could support an open-ended theory of continuity. *See, e.g.*, *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty.*, 424 F.3d 659, 674 (7th Cir. 2005) (finding that the plaintiff "pleaded himself out of showing a continuing threat of continued activity, because the alleged scheme had a natural ending point"); *Vicom*, 20 F.3d at 783 ("[A]cts that focus on a clearly defined, discrete, and finite goal often import no inherent threat of continuing misconduct." (citation omitted)).

Adriane argues that the complaint pleads an ongoing scheme because it alleges that the AJJ Trust continues to own partnership interests in each of the Birds and that Joshua continues to withhold and misrepresent information about the Trusts and Birds. Thus, Adriane contends that "[s]o long as the relevant entities continue to exist, Josh[ua] will continue to repeat his schemes." Doc. 25 at 37. However, Joshua's acts of concealment and the ill-gotten gains from his fraudulent actions do not demonstrate a threat of repetition. *See Gamboa*, 457 F.3d at 708 n.2 ("[A]cts to conceal the underlying wrongdoing in a RICO suit do not carry with them the threat of future harm."); *Patel v. Mahajan*, No. 11 C 4545, 2012 WL 3234397, at \*4 (N.D. Ill. Aug. 6, 2012) ("And while the Veluchamys may, as the Patels allege, continue to conceal and benefit from their ill-gotten gains, that does not establish the threat of repetition necessary for open-ended continuity."); *Bingham v. Zolt*, 683 F. Supp. 965, 970 (S.D.N.Y. 1988) ("To say that [the defendants'] continuing control of the music companies constituted ongoing criminal activity would allow plaintiffs to turn every finite scheme—or at least those involving economic crimes—into an enterprise simply by characterizing the defendant's subsequent enjoyment of the proceeds of the scheme as continuous criminal activity."). Regardless of whether Joshua has yet accomplished his clear and terminable goal, the scheme has a natural ending point. Nothing in

the complaint suggests that Joshua's fraudulent scheme to defraud the Trusts threatens repetition on other trusts or entities. As a result, Adriane has not sufficiently alleged continuity based on an open-ended series of misconduct. The Court must now consider whether she has sufficiently alleged continuity based on a closed-ended series of misconduct.

c.      **Continuity Based on Closed-Ended Conduct**

A closed-ended theory of continuity "involves a course of criminal conduct that has ended" but that "carries with it an implicit threat of continued criminal activity in the future" because of its "duration and repetition." *Jennings*, 495 F.3d at 473 (citation omitted); *Roger Whitmore's*, 424 F.3d at 672. Because the closed-ended inquiry "asks whether there were enough predicate acts over a finite time to support a conclusion that the criminal behavior would continue," the inquiry focuses on what are known as the *Morgan* factors: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes[,] and the occurrence of distinct injuries." *Menzies*, 943 F.3d at 337 (citation omitted); *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). No one factor is dispositive; rather, a court is to consider the *Morgan* factors "with the goal of achieving a natural and commonsense result, consistent with Congress'[] concern with long-term criminal conduct." *Roger Whitmore's*, 424 F.3d at 673 (internal quotation marks omitted). Considering the *Morgan* factors, the Court finds that Adriane has not adequately alleged a closed-ended pattern of racketeering activity.

The Court begins with the duration of the alleged activity, which "is the single most important aspect of the closed-ended continuity analysis." *Vicom*, 20 F.3d at 781. Joshua contends that a majority of the alleged predicate acts merely concealed the underlying fraudulent scheme and therefore cannot extend the scheme's duration for RICO purposes. *See Jennings*,

26

495 F.3d at 474 ("But actions, even if themselves illegal, taken in an effort to cover up a criminal scheme 'do nothing to extend the duration of the underlying . . . scheme.'" (alteration in original) (citation omitted)).  However, the complaint alleges that at least part of the underlying scheme continued until 2017.  *See, e.g.*, Doc. 1 ¶¶ 121–23, 184 (alleging that Joshua wrongfully paid himself management fees in 2015, 2016, and 2017).  So, only the acts of concealment after 2017 fail to extend the duration of the scheme.  Thus, the complaint sufficiently alleges that the underlying scheme endured for over ten years: from 2006 (when Joshua wrongfully took $129,000 from the AJJ Trust) through 2017 (when Joshua last made a false statement via wire regarding the wrongful management fees in furtherance of the fraudulent scheme).[3]  This length favors a finding of closed-ended continuity.  *See Morgan*, 804 F.2d at 976 (finding plaintiff sufficiently alleged continuity where they "alleged that defendants committed several acts of mail fraud over a period of . . . nearly four years"); *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 960 (N.D. Ill. 2002) (finding allegations that racketeering activity lasted seven years were sufficient to plead continuity).

However, the remaining *Morgan* factors cut against a closed-ended continuity finding. The alleged predicate acts affected only a few individuals (the Trusts' beneficiaries) and were all committed in furtherance of a single scheme with the sole purpose of defrauding the Trusts of money and property.  *See Roger Whitmore's*, 424 F.3d at 673–74 (finding that "a single, isolated scheme" with only twelve or so victims supported "the conclusion that [the plaintiff] has not shown closed-ended continuity"); *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 599 (7th Cir. 2001) (noting "single fraudulent scheme with only one injury to one victim was not a

---

[3] Adriane contends that the scheme endured for twenty years, presumably from when Joshua took over as Trustee to when he attempted to close out the Trusts.  But "only the predicate acts of *racketeering* count for the duration factor."  *Nesbitt v. Regas*, No. 13 C 8245, 2015 WL 1331291, at *16 (N.D. Ill. Mar. 20, 2015).

'pattern of racketeering activity'"). Each alleged victim also suffered the same injury as a result of the same alleged scheme: the loss of money and beneficial interests in the HGB Partnerships. *See Vicom*, 20 F.3d at 782 (concluding that the plaintiff's alleged losses on cancelable or potentially cancelable leases were not distinct because they stemmed "from the same original contract and similar predicate acts"); *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1268–69 (7th Cir. 1990) (finding that "identical economic injuries suffered over the course of two years stemming from a single contract were not the type of injuries Congress intended to compensate via the civil provisions of RICO"); *Star Forge Mfg., Inc. v. F.C. Mason, Inc.*, No. 02 C 50133, 2002 WL 31248559, at *2 (N.D. Ill. Oct. 4, 2002) (finding that the plaintiff failed to allege closed-ended continuity in part because there was "one and only one scheme—the diversion of customers and business . . . with one victim . . . and one injury (the loss of business)"). Moreover, the complaint alleges, at most, a handful of wrongful acts on behalf of Joshua: concealing his conversion of partnership distributions from the Trusts and unlawful management fees; wrongfully taking $129,000 from the AJJ Trust in 2006; and attempting to persuade Adriane to conceal his acts from law enforcement. *See Roger Whitmore's*, 424 F.3d at 673 (characterizing "several different instances of [alleged] mail fraud," various phone calls, and a "handful of face-to-face meetings" as a "fairly small number of predicate acts [that] cut[] against showing continuity"). Finally, while there is some variety among the alleged predicate acts, a vast majority of them are wire fraud which "'are unique among predicate acts' because multiplicity of such acts 'may be no indication of the requisite continuity of the underlying fraudulent activity.'" *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992) (citation omitted).

But even if the *Morgan* factors had tipped the scales in favor of closed-ended continuity, the Court would still find such continuity lacking. *See Gamboa*, 457 F.3d at 709–10 (reversing a finding of continuity that was supported by an analysis of the *Morgan* factors). The Seventh Circuit has explained that where a

> complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim.

*Id.* at 709. As in *Gamboa*, "the criminal activity, as alleged, had a built-in end point," and the complaint does not include any basis to suggest misconduct by Joshua beyond this alleged scheme "or to otherwise indicate that [Joshua has] repeated or will repeat [his] alleged unlawful behavior" elsewhere. *Id.* at 708. The alleged scheme has a "built-in end point" that inherently forecloses a finding of closed-ended continuity. *See id.* at 709; *Kaye v. D'Amato*, 357 F. App'x 706, 716 (7th Cir. 2009) (finding that the plaintiff did not demonstrate closed-ended continuity because, among other things, the alleged scheme would have ended once its goal was accomplished).

In conclusion, Adriane fails to sufficiently allege that Joshua engaged in a "pattern" of misconduct that RICO addresses. Instead, at bottom, Adriane's claims seek redress for her brother's fraudulent operation of a family trust. As courts in this Circuit have repeatedly stated, RICO is not the appropriate vehicle for such claims. *See Jennings*, 495 F.3d at 472 ("[RICO] was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions."); *James Streibich*, 2021 WL 1546439, at *5 (dismissing RICO claim in part because "[t]he complaint describe[d] conduct that might plausibly state a claim for fraud against

29

[defendant], but RICO does not penalize isolated criminal activity or garden-variety fraud”);

*Wankel v. S. Ill. Bancorp, Inc.*, No. 06-cv-0619, 2007 WL 2410328, at *10 (N.D. Ill. Aug. 21,

2007) (dismissing RICO claims that alleged a fraudulent loan scheme and noting that “it

seem[ed] that Plaintiffs’ cause of action constitute[d] precisely what the Supreme Court and

Seventh Circuit courts hope to forestall”); *Cmty. Ins. Servs., Ltd. v. United Life Ins. Co.*, No. 05-

CV-4105, 2006 WL 2038652, at *13 (S.D. Ill. Mar. 24, 2006) (dismissing RICO claims for what

was “best described as a business dispute” and noting that “the allegations in the complaint do

not support the inference that Defendants in this case are seasoned criminals capable or likely to

commit similar or more devious crimes in the future”).  Because she has failed to allege an

essential element, the Court dismisses Adriane’s RICO claims (Counts IV and V).

**B.**    **Breach of Fiduciary Duty Claims**

Defendants next argue that Adriane fails to sufficiently allege a breach of fiduciary duty

claim against Joshua or that Abdo participated in that breach.

**1.  The Illinois Uniform Limited Partnership Act**

Defendants argue that the Illinois Uniform Limited Partnership Act (the “Act”) isolates

them from liability for any actions related to the HGB Partnerships (i.e., converting distributions

due to the Trusts and diluting the Trusts’ partnership interests) because Joshua committed those

actions as general partner of the HGB Partnerships (in his capacity as Glazier Corp.’s President),

not as Trustee of the Trusts.  While it is true that the Act protects limited partners from liability

“for an obligation of the limited partnership,” 805 Ill. Comp. Stat. 215/303, Defendants’

convoluted argument ignores the allegations of the complaint—Adriane’s claims do not seek

redress for obligations of the HGB Partnerships and do not arise from any duties that Joshua

owed the Trusts as a limited partner of the HGB Partnerships.  *See Lansing v. Carroll*, 71 F.

30

Supp. 3d 765, 771 (N.D. Ill. 2014) (rejecting argument that liability protections of a limited partner from obligations of the partnership are relevant to breach of fiduciary duty claims). Instead, the complaint alleges that Joshua owed fiduciary duties to the Trusts and their beneficiaries as their Trustee, including to "serve the beneficiaries' interests with complete loyalty" and "refrain from dealing with the trust property for his individual benefit." Doc. 1 ¶ 133. The complaint alleges that Joshua breached those duties by, among other things, converting the Trusts' funds for his own benefit. Regardless of which hat Joshua wore at the time he took these actions, the complaint alleges that the actions breached the duties Joshua owed as Trustee of the Trusts and that Joshua took those actions.[4] Unsurprisingly, Defendants fail to cite any authority to support their position that a trustee can evade his fiduciary duties simply because he and the trust are partners in the same limited partnership. Thus, the Act provides no basis for the Court to dismiss Adriane's claims.

### 2. Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty under Illinois law, Adriane must allege that: "(1) a fiduciary duty existed, (2) the duty was breached, and (3) the breach of the duty proximately caused damages." *Gavin/Solmonese LLC. v. Kunkel*, No. 16-CV-1086, 2016 WL 3612123, at *4 (N.D. Ill. July 6, 2016). Joshua argues that Adriane fails to sufficiently allege causation for the following alleged breaches: Joshua commingled funds from the AJJ Account with Glazier Corp.'s and his own accounts, failed to maintain bank accounts for the Descendant's Trusts, and failed to keep accurate records for the AJJ Trust. However, the complaint alleges that starting in 2009, Joshua commingled these funds by "depositing all of the AJJ Trust's income and earnings directly into Glazier Corp.'s accounts." Doc. 1 ¶ 75. It further

---

[4] And Abdo's argument that the Act insulates him, as a limited partner, from "fiduciary duty liability," is misplaced given that Adriane alleges Joshua, not Abdo, breached a fiduciary duty. Doc. 16 at 4.

alleges that Joshua's breaches "deprived Adriane and the Adriane Trust of their share of millions of dollars." *Id.* ¶ 136. Joshua asserts that the complaint "merely recite[s] the proximate causation element of a breach of fiduciary duty claim," but the aforementioned allegations clearly go beyond a "bare recitation." Doc. 18 at 36. So, the Court declines to dismiss Adriane's breach of fiduciary duty claim on this basis. *See C.O.A.L., Inc. v. Dana Hotel, LLC*, 2017 IL App (1st) 161048, ¶ 73 (finding that complaint sufficiently alleged a breach of fiduciary duty claim by alleging defendant's commingling and diversion of funds "prevented plaintiff from realizing profit").

Joshua next argues that the Court should dismiss the claim because certain alleged breaches fail to meet Rule 9(b)'s heightened pleading requirements. *See, e.g.*, Doc. 1 ¶ 134(a) (alleging Joshua "[e]xploit[ed] his position as Trustee"); *id.* ¶ 134(b) (alleging Joshua "act[ed] to enrich himself"). "Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations." *Borsellino*, 477 F.3d at 507 (citation omitted). Although Adriane describes Joshua's breaches as fraudulent in pleading her breach of fiduciary duty claim, this singular mention does not require the imposition of a heightened pleading standard because the claim exists independent of her allegations of fraud or concealment contained in the complaint. For example, the complaint alleges that Joshua's control of Glazier Corp., the HGB Partnerships, and the Trusts allowed him to commingle the AJJ Trust's income with Glazier Corp.'s accounts, irrespective of any fraudulent misrepresentations or concealment. The allegations regarding Joshua's failure to follow the provisions of the AJJ Trust Agreement regarding a co-trustee also do not sound in fraud. Thus, Rule 9(b) does not require dismissal of Adriane's breach of fiduciary duty claim. *See Fed. Deposit Ins. Corp. v. Patel*, No. 19-cv-6917, 2020 WL 6681348, at *4 (N.D. Ill. Nov. 12, 2020)

(declining to apply Rule 9(b) to breach of fiduciary duty claim and noting "to the extent that the complaint alleges both fraudulent and nonfraudulent forms of concealment, only the first allegation is even subject to – and thus potentially dismissible under – Rule 9(b)"); *Carlson v. Northrop Grumman Corp.*, 196 F. Supp. 3d 830, 837 (N.D. Ill. July 11, 2016) ("In the absence of underlying fraud allegations, claims for breach of fiduciary duties are generally not subjected to heightened 9(b) requirements."); *Cement-Lock v. Gas Tech. Inst.*, No. 05 C 0018, 2005 WL 2420374, at *17 (N.D. Ill. Sept. 30, 2005) (declining to apply Rule 9(b) to breach of fiduciary duty claim that alleged breaches "based on their alleged self-dealing, non-arm's-length deals, and misappropriation of Cement-Lock Group's monetary and intellectual property, even in the absence of fraud").

### 3. Participation in Breach of Fiduciary Duty

To state a claim for one's participation in a breach of another's fiduciary duty, the plaintiff must sufficiently allege "(1) an act or omission which furthers or completes the breach of trust by the trustee;" "(2) knowledge at the time that the transaction amounted to a breach of trust, or the legal equivalent of such knowledge;" and (3) "that the defendant benefitted from the breach." *Lansing v. Carroll*, No. 11 C 4153, 2013 WL 589242, at *2 (N.D. Ill. Feb. 14, 2013) (citations omitted). Abdo argues that the complaint fails to sufficiently allege participation and knowledge.

The complaint alleges that Abdo actively participated in Joshua's breaches of his fiduciary duties to the Trusts and their beneficiaries by: (1) signing one of the purportedly restated partnership agreements for the Birds; (2) accepting transfers of the AJJ Trust's interest in three of the Birds; and (3) failing to inform Adriane of Joshua's actions, despite his knowledge of them, for the remaining two Birds. Abdo characterizes these actions as "passive and indirect"

33

and contends that his "mere act of accepting partnership interests or distributions" is insufficient to form the basis for a participation claim. Doc. 16 at 6–7. However, one of the ways in which Joshua allegedly breached his duties was "decreasing or eliminating the AJJ Trust's interest in the Birds while increasing the interest of himself . . . and Abdo." Doc. 1 ¶ 134(g). Abdo allegedly agreed to eliminate the AJJ Trust's interest in Eagle and accepted transfers of the AJJ Trust's interests in four out of six of the Birds (decreasing the AJJ Trust's interest and increasing his own). At this stage, these allegations suffice to allege that Abdo acted in furtherance of Joshua's breach. *See Lansing*, 2013 WL 589242, at *2–3 (finding complaint sufficiently pleaded participation by alleging that the third-party, who benefitted from the transaction, "sign[ed] the transfer agreement and assert[ed] ownership over [plaintiff's] interests" where alleged breach was the fraudulent purchase of plaintiff's interests); *In re John Dawson & Assocs., Inc.*, 271 B.R. 270, 273 (N.D. Ill. 2001) (finding complaint sufficiently alleged that wife participated in husband's breach by alleging she knowingly accepted benefits of unlawful transactions).

Abdo next argues that the complaint fails to sufficiently allege he knew such actions amounted to a breach of Joshua's fiduciary duties. The complaint alleges that Abdo knew Joshua was "Trustee of the AJJ Trust, and as such owed fiduciary duties to the AJJ Trust and its beneficiaries, including the duty to act in the AJJ Trust's best interest and to avoid self-dealing," Doc. 1 ¶ 140, and "that Joshua Glazier's acts in decreasing the AJJ Trust's shares in the Birds amounted [to] a breach of his fiduciary duties to the AJJ Trust and its beneficiaries," *id.* ¶ 150. Abdo contends that this allegation inappropriately infers that simply because Abdo knew Joshua was Trustee, he also knew the scope of Joshua's duties as Trustee. However, the Court reads the complaint to allege that Abdo knew that Joshua owed the AJJ Trust a "duty to act in the AJJ Trust's best interest and to avoid self-dealing" and that transferring the AJJ Trust's partnership

interests to himself and/or Abdo in exchange for no consideration breached those duties. *Id.* ¶ 140. The following facts in the complaint support these allegations: Abdo is an experienced real estate professional, he and the AJJ Trust are both limited partners in the Birds, and he worked for the Birds' general partner (Glazier Corp. and Joshua as President) at the time. Thus, at this stage, the Court must accept as true these well-pleaded allegations.

Moreover, common law (as opposed to the trust documents) creates the duties of a trustee, so Abdo's argument that the complaint does not allege Abdo saw or knew the terms of the AJJ Trust Agreement is unavailing. *See White v. Macqueen*, 360 Ill. 236, 248 (1935) ("Such power grows out of the inherent power of that court over trustees. It may exact from him the utmost fidelity and good faith and will not permit him to deal with the subject-matter of the trust for his own benefit."). Adriane has adequately alleged that Abdo participated in Joshua's breach of his fiduciary duty to act in the AJJ Trust's best interests and avoid self-dealing by accepting the AJJ Trust's partnership interests for free when Abdo knew such conduct breached Joshua's duties to the AJJ Trust.[5] As a result, the Court denies Abdo's motion to dismiss Adriane's participation in a breach fiduciary duty claim. *See In re John Dawson*, 271 B.R. at 272–73 (denying motion to dismiss participation in breach of fiduciary duty claim where complaint alleged wife of fiduciary knowingly participated in breach by "permitting and accepting" inherently "questionable" transactions); *Conant v. Karris*, 165 Ill. App. 3d 783, 791 (1987) (finding plaintiff sufficiently alleged real estate broker's brother participated in broker's breach

---

[5] This case is therefore distinguishable from those relied upon by Abdo. *See Ottawa Sav. Bank v. JDI Loans, Inc.*, 374 Ill. App. 3d 394, 403 (2007) (granting motion to dismiss *inducement* of a breach of fiduciary duty claim because complaint "did not plead that defendants knew who [plaintiff] was, knew the contents, terms, or conditions of [plaintiff's] contract or relationship with [fiduciary], or caused or induced [fiduciary] to breach any obligation to [plaintiff]); *Johnson v. Filler*, 2018 IL App (2d) 170923, ¶ 20 (granting motion to dismiss *aiding and abetting tortious interference* claim because allegations implied that an attorney did not know of the alleged tortious interference and took no actions to further it).

by alleging the brother benefitted in transaction by using confidential information provided by broker).

### C.    Unjust Enrichment Claims

Adriane premises her unjust enrichment claims against Glazier Corp. and Abdo on some of the same allegations as those underlying her breach of fiduciary duty claims—that Joshua wrongfully diverted money and partnership interests due to the AJJ Trust to either himself, Glazier Corp., or Abdo.  Defendants admit that Adriane's unjust enrichment claims are "tied to [these] related claims" and "stand or fall with [them]."  *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).  Thus, because the Court finds that Adriane's breach of fiduciary duty claims survive dismissal, her unjust enrichment claims survive as well.[6]

### D.    Common Law Fraud

Finally, Joshua contends that Adriane fails to sufficiently allege a claim for common law fraud.  To state a claim for fraud, Adriane must allege:

> (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance.

*Doe v. Dilling*, 228 Ill. 2d 324, 342–43 (2008).  Joshua argues that the complaint does not sufficiently allege justifiable reliance or damages.

---

[6] Glazier Corp. also argues that the complaint fails to allege that "Glazier Corp. did not earn the money it received by virtue of its work and/or investment in the HGB Partnerships."  Doc. 18 at 39.  However, this argument again ignores the allegations of the complaint.  *See* Doc. 1 ¶ 68 (alleging Joshua "diverted nearly all of the AJJ Trust's share of the HGB Partnerships' earnings into Glazier Corp.'s accounts").  Similarly, Abdo argues that *Sherman v. Ryan*, 392 Ill. App. 3d 712 (2009), requires dismissal of the unjust enrichment claim because the complaint fails to allege that Abdo did not earn the income he retained.  However, the court in *Sherman* analyzed an unjust enrichment claim under Delaware law, which differs from such a claim under Illinois law.  *Compare Sherman*, 392 Ill. App. 3d at 734 (Delaware unjust enrichment claim requires plaintiff to plead "the absence of justification" for the benefit), *with HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160 (1989) (Illinois unjust enrichment claim only requires plaintiff to plead that "defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience").

As to reliance, Joshua contends that Adriane's fraud claim fails because it does not allege any action that Adriane took in reliance on Joshua's fourteen alleged false statements. However, the complaint alleges that Joshua made these misrepresentations "[t]o prevent Adriane from discovering his wrongdoing" and "to allow Joshua [] to continue to retain the income and assets of the AJJ Trust for himself and/or Glazier Corp." Doc. 1 ¶ 124. The complaint further alleges that Joshua's misrepresentations in fact "induce[d] Adriane not to further question his management of the AJJ Trust and HGB Partnership funds," *id.*, and "to not question his purported disclosures concerning the AJJ Trust's finances," *id.* ¶ 129, and as a result, she did not discover his fraud for many years. This suffices to allege reliance in this context. *See Wolfram v. Wolfram*, 78 F. Supp. 3d 758, 767 (N.D. Ill. 2015) (denying motion to dismiss fraud claim where trust beneficiary adequately alleged theory of reliance by alleging trustee "withheld material information . . . so that [the beneficiaries] 'would not question' her" which induced trustee to do "nothing for over a decade").

Joshua also argues that based on the allegations in the complaint, Adriane's reliance on Joshua's statements after 2009 was not justified because the false K-1s revealed conflicting information about the Trusts. However, as explained above, this involves a factual argument more appropriate to resolution on a fully developed record. *See BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 852 (N.D. Ill. 2021) (noting that "finding whether the Plaintiffs could have discovered the alleged fraud through research was a 'fact-intensive inquiry' inappropriate for resolution at the motion to dismiss stage" (citation omitted)). The complaint alleges that Adriane "reasonably relied" on Joshua's misrepresentations because of his position as Trustee and "his business acumen." Doc. 1 ¶ 153. At this stage, these allegations suffice. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) ("Under Illinois law, justifiable reliance

exists when it was 'reasonable for plaintiff to accept defendant's statements without an independent inquiry or investigation.'" (citation omitted)).

Finally, Joshua argues that the complaint fails to sufficiently allege causation because it fails to explain how the fourteen misrepresentations caused her denial of funds or her tax liability.[7] But this argument fails for the same reasons Joshua's reliance argument fails. The complaint alleges that Joshua's misrepresentations and concealment of information induced Adriane to not question his actions as Trustee, which allowed his misconduct to continue. The complaint further alleges that Joshua's misconduct included stealing or diverting funds from the Trusts and causing Adriane to pay taxes for income she did not receive. *See, e.g.*, Doc. 1 ¶ 111 (alleging Joshua "caused Adriane to personally pay income taxes" on income he converted for his own use). This sufficiently alleges that damage resulted from Adriane's reliance on Joshua's misrepresentations. *See Wolfram*, 78 F. Supp. 3d at 767 (finding complaint sufficiently pleaded fraud claim by alleging beneficiary's "induced inaction gave [trustee] time to dispose of trust assets that may otherwise have gone to [beneficiary]"). As a result, the Court denies Joshua's motion to dismiss Adriane's fraud claim.[8]

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss [15[, [17]. The Court dismisses Adriane's RICO claims (Counts IV and V) without

---

[7] Joshua also contends that the Court should dismiss Adriane's fraud claim because it is duplicative of her breach of fiduciary duty claim. In response, Adriane correctly points out that Federal Rule of Civil Procedure Rule 8(d)(2) expressly permits "set[ting] out 2 or more statements of a claim or defense alternatively . . . either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2). Joshua does not respond to this clear authority and thus, the Court will not address his argument further.

[8] Joshua asserts that if the Court dismisses Adriane's RICO claims but her state law claims remain, "further briefing may be necessary to determine whether diversity jurisdiction exists." Doc. 18 at 33 n.8. The complaint alleges that Adriane is a citizen of Florida, Defendants are citizens of Illinois, and that the amount in controversy exceeds $75,000. If Defendants wish to challenge the sufficiency or truth of these allegations, they must do so through a Rule 12(b)(1) motion.

prejudice.  But Adriane's breach of fiduciary duty, participation in a breach of fiduciary duty, fraud, and unjust enrichment claims remain pending before this Court.


Dated: August 30, 2022

 

SARA L. ELLIS
United States District Judge